## Harper *v.* State

No. 42767 January 25, 1965 171 So. 2d 129

*R. Jess Brown,* Jackson; *Melvin L. Wulf, Bertram Perkel,* New York, N. Y., for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

ETHRIDGE, J.

Willie B. Harper, appellant, was tried and convicted in the Circuit Court of Scott County of an attempted rape of a sixteen-year old white girl of previous chaste character. He was sentenced to life imprisonment, and from that conviction and judgment appeals to this Court. For the reason hereinafter stated, we reverse and remand the case. We shall not undertake to state the facts except insofar as they may relate to the issues presented for decision.

The appellant assigns as error three items:

(1) The trial court erred in failing to sustain appellant's motions to quash the indictment and to quash the venire, on the grounds that Negroes were systematically excluded from the grand jury which indicted him, and Negroes were systematically excluded from the venire from which petit jurors were drawn, all in vio-

lation of the due process and equal protection clauses of the fourteenth amendment to the United States Constitution.

(2) It erred in overruling appellant's motion for a directed verdict, because the failure of the police to bring him before a judicial officer immediately after his arrest denied him due process of law guaranteed by the fourteenth amendment.

(3) The court erred in overruling appellant's objection to the introduction in evidence of a written confession, asserting it was extracted from appellant involuntarily and during a period of time when he was denied the assistance of counsel, in violation of the due process clause of the fourteenth amendment.

News of the occurrence had immediately permeated the community and the countryside. It happened on Friday night, November 23, 1962. An automobile identified as belonging to Harper was found at or near the scene of the alleged crime and people began searching for him. He had fled, leaving the car nearby. He traveled over the countryside, but Saturday night had his wife telephone McCrory, who had been sheriff, deputy sheriff, and chief of police at various times covering a period of about twenty-five years. McCrory had seen Harper's wife, and she promised to try to locate Harper and let McCrory know. On Sunday morning before daylight McCrory was called by appellant's wife, and he then talked over the telephone with appellant. Harper wanted the deputy to come to the home of his father-in-law, which he did, and Harper surrendered to him. Upon entering the house McCrory told Harper that he was under arrest. He seached him for a gun, and Harper stated he did not have any gun, but that he left it in the woods. Harper's wife fixed some food and gave it to him, and he and McCrory got into a car and drove to Forest. On the way to town, where the jail was situated, appellant voluntarily confessed to McCrory. When

they reached the county seat, it was decided to carry Harper to Jackson, Hinds County, Mississippi, and there place him in the jail, because of the unsafe condition of the Forest jail.

■■■ He was questioned in the jail on Sunday and also Monday morning. Around noon or a little after on Monday, he signed a written statement at the office of the Highway Patrol in the City of Jackson, which was a confession of the crime and accorded with the oral confession to McCrory. The court heard the evidence relative to the written confession and held that it was voluntary. However, the issue is close, and the evidence inconclusive. Escobedo v. Illinois, 377 U.S. 478, 84 S. Ct. 1758 (1964). We think the trial court should have sustained the objection to the introduction of the written confession.

■■■ Nothing that we have said about the written confession is meant to cast any reflection on the oral confession which Harper gave McCrory on the way to the jail. No assignment of error is made regarding it, nor does appellant argue it was not competent. We think it was admissible. U. S. v. Mitchell, 322 U.S. 65, 64 S. Ct. 896, 88 L. Ed. 1140 (1944) ; Parker v. State, 244 Miss. 332, 141 So. 2d 546 (1962) ; Winston v. State, 209 Miss. 799, 48 So. 2d 513 (1950).

■■■ Harper was not given a preliminary hearing before his indictment, nor did he have an attorney. The officers testified that he was advised of his right to a lawyer, but he stated he did not want one, or a preliminary hearing. Mississippi Code Annotated section 2473 (1956) provides: ''Every person making an arrest shall take the offender before the proper officer without unnecessary delay for examination of his case.'' A preliminary hearing should have been held, by carrying appellant before a magistrate, advising ·him of the nature of the charge, and permitting him to plead to it, or giving him an opportunity to waive preliminary hearing, if he

wished. The sheriff has no power to accept such a waiver, which must be done before a magistrate. Miss. Code Ann. § 2486 (1956).

■■■ ■■ However, the failure to carry Harper before a judicial officer shortly after his arrest did not entitle him to a directed verdict of not guilty. Without the written confession, the overwhelming weight of evidence reflects defendant's guilt. The evidence as a whole, including the admissible oral confession, is ample to submit the issue of guilt to the jury. Generally, detention without commitment is one among other factors in considering whether a confession is free and voluntary. Gordon v. State, 160 So. 2d 73 (Miss. 1964); Moore v. State, 207 Miss. 140, 41 So. 2d 368 (1949), appeal dismissed and cert. denied, 338 U.S. 844, 70 S. Ct. 93, 94 L. Ed. 516 (1949); Parker v. State, 244 Miss. 332, 141 So. 2d 546 (1962). In this case the admissible oral confession was made by Parker almost immediately after his arrest, before any opportunity existed to bring him before a magistrate. Section 2473 means what it says, and police officers should take an accused before a judicial officer for preliminary hearing "without unnecessary delay." Winston v. State. 209 Miss. 799, 48 So. 2d 513 (1950). But the legality of the detention after the lawful arrest is not the issue here.

The dispositive question in this case arises on the first assignment of error, concerning the alleged systematic exclusion of Negroes from jury service in Scott County. A careful examination of the undisputed facts, and of well established decisions of the courts, requires us to hold that the circuit court erred in overruling appellant's motion to quash the indictment and to quash the venire on this ground. The case will be reversed and remanded to the trial court for re-indictment and retrial.

The record reflects that in the 1960 census Scott County had a total population of 21,139, of which 13,050 or

62% were white and 8,089 or 38% were colored. There are approximately 5,200 registered electors in the county, of which 5,172 are white, being approximately 99.5%. Of these registered electors 28 are Negroes, or less than 1%. In Supervisor's District 1 there were 1600 qualified electors. The supervisor testified that he knew of no Negroes who were registered. In Beat 2 it was shown that there were about 600 qualified voters, with two or three Negroes. In Beat 3 there were 1300 qualified electors, with three or four Negroes. In Beat 4 there were 800 registered electors, with four Negroes, all of whom were over 61 years of age, so that they could claim exemption from poll taxes. In Beat 5 there were 800-900 registered electors. That supervisor knew of one Negro who was registered. He was born in 1881, so he would now be in his eighties. The circuit clerk testified that in Scott County there were 28 Negroes registered and qualified to vote, and as qualified electors, eligible for jury service, and three or four were registered but not qualified. It was stipulated there were no Negroes on the venire beginning March 11, 1963, being the day of the trial of this case on the merits. The evidence showed that there was one Negro on the grand jury, and as stated none on the venire. There were two terms of court in 1962, and one Negro was drawn on the venire. There was one in 1963, the year of this trial, and one in 1962. There was one called in 1961. There were none in 1960, none in 1959, none in 1958, two in 1957, one in 1956, two in 1955, and none in 1954.

 ██ Since 1880 it has been settled law that systematic and discriminatory exclusion of Negroes from jury service violates the fourteenth amendment of the United States Constitution. In 1907, this Court in Farrow v. State, 91 Miss. 509, 45 So. 619, held that purposeful exclusion of Negroes from jury venires was unconstitutional. Gordon v. State, 243 Miss. 750, 140 So. 2d 88 (1962); U.S., *ex rel.* Goldsby v. Harpole, 263 F.

2d 71 (5th Cir. 1959), certiorari denied, 361 U.S. 838, 80 S. Ct. 58, 4 L. Ed. 2d 78 (1959); Seay v. State, 212 Miss. 712, 55 So. 2d 430 (1951); Patton v. Miss. 332 U.S. 463, 68 S. Ct. 184, 92 L. Ed. 76, 1 A.L.R. 2d 1286 (1947); Annots., 94 L. Ed. 856 (1950), 97 L. Ed. 1249 (1953), 2 L. Ed. 2d 2040 (1958); 31 Am. Jur. *Jury* §§ 97-99 (1958). In many of these cases there was a complete lack of Negro jurors on the panels, with the condition existing for many years. Long continued omission of Negroes from jury service establishes a prima facie case of systematic discrimination. The burden of proof is then upon the State to refute it.

 ██ In the instant case, the question arises whether jury service by the few Negroes as enumerated in this record either would be sufficient to show there was no unconstitutional discrimination, or to rebut the prima facie case under the *Patton* rule. We do not think it is. Under the facts set forth above and the established cases on the subject, the burden was on the State to rebut the prima facie case developed by appellant, or to justify the exclusion as having been brought about for some reason other than racial discrimination. The State did not do this.

For example, in *Harpole* it was said: "We cannot assume that Negroes, the majority class in Carroll County, had en masse, or in any substantial numbers, voluntarily abstained from registering as electors and, by such action, had rendered themselves ineligible for jury duty. If the registration officials freely and fairly registered qualified Negroes as electors, that fact rested more in the knowledge of the State. The burden was on appellee, as the State's representative, to refute the strong prima facie case developed by the appellant. The only Negroes ever proved registered as electors in Carroll County were two who had died before 1954."

The other cases are in accord with *Harpole* in holding that the duty is on the State to rebut the prima facie

case made. Here there was no effort made to show why there were so few Negroes who had served on the panel, or were registered, or why the one, two or three mentioned in the evidence would be sufficient to meet the burden of rebutting appellant's prima facie case.

Token representation occurred in United States v. Wiman, 304 F. 2d 53, 59, 67 (5th Cir. 1962). The male population of jury age in Mobile County, Alabama, was divided substantially in the proportions of 68.3% whites and 31.7% nonwhites.

The opinion in *Wiman* reviewed the cases and said:

"There was no testimony in this case that, on the average, Negroes in Mobile County are any less qualified for jury service than are whites. Indeed, the testimony of one of the jury commissioners and of a practicing attorney in Mobile were to the effect that the reputations and qualifications of members of the two races were about the same. . . . (I)n 1958, the year of Seals' trial, and the preceding ten years, less than 2% of the persons on the jury rolls were Negroes. . . .

"Actually, whether the presence of a few Negroes on a venire containing many names is evidence tending to prove or to disprove racial discrimination depends upon the proportions of Negroes and whites who are qualified for jury service. . . . Fairness in selection does not require proportionate representation of races upon a jury venire. . . . It is nonetheless true that very decided variations in proportions of Negroes and whites on jury lists from racial proportions in the population, which variations are not explained and are long continued, furnish sufficient evidence of systematic exclusion of Negroes from jury service. Brown v. Allen, 1953, 344 U.S. 443, 471, 73 S. Ct. 397, 97 L. Ed. 469. It was there said: 'Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. Texas, 311 U.S. 128 (61 S. Ct. 164, 85 L. Ed. 84).' In the case cited, Negroes constituted 20% of the

population of the County and 10% of the poll tax payers but very few Negroes served on grand juries. The Court commented, 'Chance and accident alone could hardly have brought about the listing for grand jury services of so few Negroes from among the thousands shown by the undisputed evidence to possess the legal qualifications for jury service.' . . . In the present case, Negroes constituted more than 31% of those qualified for jury service but less than 2% of those on the jury rolls, and apparently no larger percentage of Negroes had ever been on the jury rolls, certainly not for the last ten years before Seals' trial.

"Not only does the respondent fail to come forward with an adequate justification to explain this long-continued, wide discrepancy between the number of qualified Negroes in the County and their representation on the jury rolls, but the evidence is practically conclusive that the method of selection at the time of Seals' trial and during the preceding years inevitably resulted in systematic exclusion of all but a token number of Negroes from the jury rolls. We conclude that the presence of no Negroes on the 18-man grand jury which indicted Seals, and of 2 Negroes on the venire of 110 persons from which came the petit jury which convicted Seals and condemned him to death was not a mere fortuitous accident but was the result of systematic exclusion of Negroes from the jury rolls.''

There are numerous other cases which hold that a substantial disparity between races and other groups in the selection of jury panels is an important factor strongly tending to show discrimination; and that token summoning of Negroes for jury service does not comply with equal protection. Brown v. Allen, 344 U.S. 443, 73 S. Ct. 397, 437, 97 L. Ed. 469, rehearing denied, 345 U.S. 946, 73 S. Ct. 827, 97 L. Ed. 1370 (1953); Smith v. Texas, 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940);

Norris v. Alabama, 294 U.S. 587, 55 S. Ct. 579, 79 L. Ed. 1074 (1935); Annot. 2 L. Ed. 2d 2040 (1958).

The above decisions apply to the facts in the present case. The circuit court erred in not quashing the indictment and the venire.

██ ██ We recognize that in some counties compliance with these constitutional requirements may present difficulties, but they must be surmounted if the criminal laws are to be effectively administered. The United States Constitution does not require proportional representation of the races on a jury, or even that members of a particular race must be on a particular jury. As a practical matter, what is required is that the county officials must see to it that jurors are in fact and in good faith selected without regard to race.

Reversed and remanded for further proceedings in accordance with this opinion.

All Justices concur, except Lee, C. J., who took no part.