187 So.2d 840 (1966)
Cloudies SHINALL
v.
STATE of Mississippi.
No. 43866.
Supreme Court of Mississippi.
June 13, 1966.
*841 Jack H. Young, R. Jess Brown, Jackson, Robert L. Carter, Barbara A. Morris, New York City, for appellant.
Joe T. Patterson, Atty. Gen., by G. Garland Lyell, Jr., Asst. Atty. Gen., Jackson, for appellee.
JONES, Justice.
Appellant was convicted of murder in the Circuit Court of Forrest County, from which conviction and a sentence to death, he appeals here.
The evidence was ample to justify the verdict, but at the threshold we are met by the question which decisions of the Federal Courts within recent years have caused to be presented in practically every case of this nature, and more recently is being confronted by us in cases below the level of capital cases. This will continue and in many cases invalidate convictions until the situation is corrected, since we are required by our oaths to recognize such decisions.
Appellant is a Negro who shot and killed a constable, a white man. He filed motions to quash the indictment and the venire, alleging that Negroes were systematically *842 excluded from the jury list solely because of race.
Similar motions were before this Court in Kennard v. State, 242 Miss. 691, 128 So.2d 572 (1961), which also involved the jury list of Forrest County, and that case was affirmed. A reading of that decision, however, shows it was so decided because appellant failed to prove even a prima facie case. There, it was a lack of evidence.
Here, it was shown the county had a total population of 52,722, of which 37,970 were whites and 14,719 were Negroes.
This indictment was returned and the case tried at the July 1965 Term. According to the Circuit Clerk, Mr. Lynd, there were two Negroes on the grand jury at the July Term; at the March Term there was one. He could not remember any Negroes on the grand jury prior to these terms. Several served on petit juries in county and circuit court sometime in 1964 and 1965. Some were called but didn't serve. Mr. Lynd had been Circuit Clerk since February 1959, and did not remember a Negro serving on a jury in a criminal case since he had been clerk.
He also testified that at the time of the trial he was under an injunction as a result of a suit by the Federal government to enjoin him from discriminating in the registration of Negroes in Forrest County, but he could not state how many he had registered since the injunction was in force.
Clyde W. Easterling, Chancery Clerk since 1952, a native of Forrest County and Clerk of the Board of Supervisors, was unfamiliar with the way jury lists were drawn and prepared. He was present when two Negroes were sworn on the grand jury at the present term, but could remember no other instance where Negroes were on a grand jury, and knew of no instance where Negroes had served on a jury in a criminal case.
Mr. Milton Evans, Superintendent of Education of the County, had 39 or 40 Negro teachers under his supervision, all of whom had B.S. or Masters Degrees. These were in the county outside the city. He did not know the number of Negro teachers inside the city.
Mr. Will Sigler, Supervisor of District One since January 1964 and a native of the county, testified the Board took names for the jury lists from the voter registration books. He picked the names of people who were eligible  some he knew, some he didn't. When asked how many Negroes he picked for that term of court, he did not know. He did not know whether there were any Negroes. He said he made no distinction between races when making the list. He did not recall any instance as long as he had lived in the county of a Negro serving on a jury in a criminal case.
Mr. Woods, Supervisor of District Two, testified he put all the names on the "poll books" of his district on the jury list.
Mr. S.C. Bowling, Supervisor of District Three since January 7, 1952, and who had lived in Forrest County since 1927, said the supervisors in making jury lists took the registration books and from those selected the names to go on the jury list. He didn't know how many qualified male electors were in his district and had no idea of the ratio between Negroes and white. He knew some Negroes had voted in his district, but did not know how many he put on the list for the present term. He noticed two Negroes impaneled on the grand jury the first day of this term, and it seemed to him that he could recall once or twice before that some have been called  but they might have been excused for personal reasons. If any had been called before, he would probably have seen them, but he did not recall seeing any. He would not say whether Negroes had or had not served on a petit jury in a criminal case.
J.A.P. Carter, Supervisor of District Four since September 1949 and a native of the county, said the Board, in making the list for the jury, would take the voters' poll books and select the names therefrom. He *843 used all qualified males on his list. Later, he said he selected "just about all" of them because his was a small district and it required "just about" every one of them. He saw two Negroes on the grand jury this term, but did not know about the term before. He did not know whether he had ever seen or heard of a Negro serving on a petit jury in a criminal case.
Some members of the bar testified but threw no great light on the question at issue.
The district attorney was called, but could definitely recall very little about Negroes on the juries. He could recall no criminal case in which a Negro served on the petit jury. Two Negroes served on the grand jury at this term and he believed one served the term before. Prior to that time he could not remember. He remembered that at the last term of court some civil cases were tried where Negroes served on the jury. Out of a list of eighty jurors summoned to appear at the present term five or six were Negroes.
From the evidence, it appears:
1. There were 14,719 non-whites and 37,970 whites in Forrest County;
2. Two Negroes served on the grand jury when the indictment here involved was returned and one or two possibly the term before;
3. There was no evidence of any serving on the grand jury at prior terms;
4. No Negro had ever served on a petit jury in a criminal case;
5. The Board of Supervisors selected their names for the jury list from the qualified registered voters;
6. No attempt had been made to qualify resident freeholders as jurors under Chapter 327, Laws of 1964;
7. Negroes constituted about twenty-six percent of the population;
8. Negroes on the venire were not shown to constitute more than seven percent of the whole at any time;
9. The circuit clerk admitted he was under an injunction from the Federal Court involving discrimination by him in the registration of Negroes.
The reference to percentages is not to infer that the juries should be on a percentage basis but is simply made as illustrative of the disparities involved and shown.
The Fifth Circuit re-announced in Billingsley, Sr., et al. v. Clayton, et al., 359 F.2d 13, April 5, 1966, that:
"* * * Minimal representation of the group claimed to have been excluded from a particular jury roll in comparison with their proportion of the population is a proper element of proof, but such proof standing alone does not constitute sufficient evidence of constitutional violation if it is adequately explained and is not long continued.
* * * * * *
"The aim and purpose of the law is to obtain juries which truly represent a cross-section of the community, but there is no constitutional requirement that such juries represent the proportional strength or exact percentage of the various components of the population. * * *"
On January 25, 1965, this Court rendered its opinion in Harper v. State, 251 Miss. 699, 171 So.2d 129 (1965). There, many of the cases to that date dealing with discriminations such as here charged were cited, with some quotations and analyses, and it was there shown:
1. Since 1880 the law has been settled that systematic and discriminatory exclusion of Negroes from jury service is violative of the 14th amendment of the United States Constitution. That this Court so held as far back as 1907. See Farrow v. State, 91 Miss. 509, 45 So. 619.

*844 2. Token representation does not comply with the law.
3. Substantial disparity between races in the selection of jury panels is an important factor strongly tending to show discrimination.
4. The state is required to rebut a prima facie case or to justify exclusion as having been brought about by some reason other than racial discrimination.
5. Proportional representation of races on a jury, or even that members of a particular race must be on a particular jury, is not required.
6. What is required is that county officials see that jurors are in fact and in good faith selected without regard to race.
The question has been asked, "What is token representation?" That can only be answered by examination of the disparities, if any, in each case and in the venires as theretofore composed.
In Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the United States Supreme Court dealt with that question. There Negro males over 21 constituted 26% of all such males in the county. Ten to fifteen percent of the jury panels drawn since 1953 were Negroes and in one case the percentage was twenty-three percent. In that period of time, Negroes served on 80% of the grand juries. There had been six to seven Negroes on petit jury venires in criminal cases, though none had served on a petit jury since 1950. The majority of the Court held:
"* * * We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%. * * *" (380 U.S. at 208-209, 85 S.Ct. at 829, 13 L.Ed.2d at 766.)
"* * * The overall percentage disparity has been small, and reflects no studied attempt to include or exclude a specified number of Negroes. * * *" (380 U.S. at 209, 85 S.Ct. at 830, 13 L.Ed.2d at 766.)
It was charged in the Swain case, supra, that the reason no Negroes had served on this or other criminal cases was because the prosecutor had always exercised his strikes to prevent Negroes from serving and that such was an invidious discrimination not sufficiently justified by the peremptory challenge system. The Court held this was a question that might require a different answer, and that when challenges were continuously used by the prosecutor in case after case with the result that no Negroes were ever on petit juries, the fourteenth amendment claim takes on added significance. The majority held that the record in Swain, supra, was not sufficient to demonstrate such had occurred. However, there were three dissenting judges.
In Scott v. Walker et al., 358 F.2d 561, decided March 31, 1966, the Fifth Circuit Court of Appeals announced these principles and stated:
"There are several principles of law that are now clear in this difficult area. The first is that the systematic exclusion of Negroes from juries in judicial districts where Negroes represent a substantial part of the population constitutes a deprivation of equal protection under the Fourteenth Amendment. Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76, where the Supreme Court said, `When a jury selection plan, whatever it is, operates in such a way as always to result in the complete and long-continued exclusion of any representative at all from a large group of negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand.' 332 U.S. 463, 469, 68 S.Ct. 184, 187. The second proposition which is equally clear is that the inclusion of a minimal or token number of Negroes on a jury list does not prevent the systematic exclusion rule from operating, for the Supreme Court has said in Brown v. *845 Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469: `Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. [State of] Texas, 311 U.S. 128, [61 S.Ct. 164, 85 L.Ed. 84]. See also United States ex rel. Willie Seals Jr. v. Wiman, 5 Cir., 304 F.2d 53, 67. A further proposition, not in dispute, is that the Constitution does not require an exact proportion between the percentage of Negroes in the population and the percentage of Negroes on the jury lists, nor does the Constitution require that any particular panel of jurors in a criminal trial include members of the race of the accused person. * * *"
The Swain case, supra, was before the Court in the Scott case, supra, and after discussing its facts and its holdings, the Court said in the Scott case:
"* * * we think it unnecessary to remand the case for further consideration by the trial court in light of the fact that the state by its own witnesses had contributed to the clear impression which we now hold that there could not conceivably have been more than one percent of the usual jury list of the Negro race. In light of the disparity between this and the 13 percent of the Negro population of the Parish, there was a strong presumption that there was a systematic exclusion within the legal understanding of these terms. Thus the burden was on the state to produce such evidence as was available to it by taking the jury lists and making proof as to the racial identity of the members. Instead, it will be noted that in the direct examinatioin of each of the members of the commission who testified on behalf of the state, no one of them was asked by the attorney for the appellee how many or what percent of the members of any of the lists were members of the Negro race. The state's efforts consisted almost solely in obtaining the conclusionary response to the question whether the commissioners participated in any plan or scheme to exclude Negroes on account of race. These answers could honestly be given by persons who had, nevertheless, by their conduct produced the result, even through no illegal or evil motive or absence of good faith, that the Constitution outlaws. See United States ex rel. Seals v. Wiman, supra, 304 F.2d page 65.
"While it may be unfortunate that there is no proof in this record as to precisely how many Negroes were listed on the list of 300 for each of the years in question, since this would make much simpler the problem of a court's passing on the question of `tokenism,' we think the evidence here adduced makes it clear beyond doubt that the number of Negroes' names listed regularly in making up the 12 lists which were subject to inquiry was so small that it is not necessary that the exact percentages be known. When given ample opportunity to make an estimate of numbers or percentages, no commissioner testified to any number that would bring the number of Negroes, when the contributions made by each of the commissioners were added together, to more than one percent on the average for the five years in question.
"It is plain from the record here that the commissioners put on the list only those personally known to them. They made no especial effort to ascertain whether there were qualified Negroes in the parish for jury service. In failing to do so they violated the rule announced by the Supreme Court through Mr. Justice Reed in Cassell v. State of Texas, [339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839,] where it was said, `When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination.' 339 U.S. 282, at 289, 70 S.Ct. 629, 633, 94 L.Ed. 839."
See also Davis v. Davis, Governor, et al., 361 F.2d 770, decided May 31, 1966, by the United States Fifth Circuit Court of Appeals.
*846 However, it is not necessary in the instant case to rely only upon a prima facie case and the state's failure to explain or rebut.
The jury lists were made from the roster of qualified, registered voters. The circuit clerk, who is the registrar of the county, admitted that the Federal Court had enjoined him from discriminating against Negroes in their attempts to register and be placed upon the list of qualified, registered voters, the very source of the jury panels, as shown by the evidence herein. This Clerk has been in office since 1959 and the injunction was in force at the trial.
Any action of the state, whether through its legislative body, its courts, its executive or administrative officers, discriminating against people in regard to jury service, solely because of race or color, denies the equal protection of laws, and violates the fourteenth amendment of the Constitution of the United States. Carter v. State of Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1899); Gibson v. State of Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896); Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879).
The Clerk made no explanation as to why the injunction was issued; made no denial that it was rightfully issued; and made no denial of the basis of the charge that he was discriminating. We therefore resort to the decided cases for further information.
In United States v. Lynd, Registrar, 349 F.2d 785 (5 Cir.1965), the Court reversed and remanded the case to the District Court for the Southern District of Mississippi with directions that said Court enter an order, constituting a finding of fact that the successive registrars of the county had engaged in acts and practices which deprived Negroes of their right to register and that they had discriminated against them because of race.
In another case of the same style, reported in 349 F.2d 791 (5 Cir.1965), the Court found the registrar, Lynd, guilty of contempt for failure to obey orders of the court regarding discrimination and provided how he might purge himself. By the opinion rendered therein, the registrar was directed and ordered to register approximately 280 Negro applicants, subject to certain possible deletions.
Under our statute, Mississippi Code Annotated section 1766 (Supp. 1964), it was the duty of the supervisors to prepare their jury lists at the April meeting each year, which we presume they did.
The last named cases were both decided June 16, 1965, after the jury list had been made. Appellant was indicted and tried at the July 1965 Term.
Proof was lacking that the people ordered by the Fifth Circuit to be registered had been registered or that the jury lists had been made after such additional registrations.
So, here, we have a judicial finding that at the time of the making of the jury list for this term  at the time of the drawing of the grand jury and the petit venires  there were actually members of the Negro race who had been denied registration solely on account of race. This denial was by the State acting through its duly elected, qualified and acting administrative officer, to-wit: the Registrar of Forrest County.
The only other assignment we deem necessary to mention is the motion for a change of venue which was overruled after a hearing. There was a full hearing, and we cannot say after considering the evidence introduced and now before us that the court abused its discretion.
For the reasons hereinbefore stated, this case is reversed and the indictment and venire quashed.
The appellant is ordered held for submission of the matter to another grand jury.
Reversed and indictment quashed, and remanded. Appellant to be held for action by subsequent grand jury.
All Justices concur.