204 So.2d 165 (1967)
Bobby Lee BOYD
v.
STATE of Mississippi.
No. 44502.
Supreme Court of Mississippi.
November 6, 1967.
*167 Pigford & Hendricks, Meridian, for appellant.
Joe T. Patterson, Atty. Gen., by G. Garland Lyell, Jr., Asst. Atty. Gen., Jackson, for appellee.
BRADY, Justice.
This is an appeal from a conviction for possession of drugs prohibited by Mississippi Code 1942 Annotated section 6831-02 (1952) under which appellant was sentenced to serve a term of two years in the state penitentiary. The relevant facts are as follows.
Over a period of time the Standard Drug Company of Meridian had experienced an unaccountable loss of 80,000 Syndrox methamphetamine pills from its inventory. Shortly before the lunch hour on August 30, 1966, Mr. E.H. Morrison, vice-president of the company, and Mr. T.W. Calcote, an employee, both took an inventory of the Syndrox pills which the company had in its stock. This inventory revealed that the company had on hand six bottles of the Syndrox pills, each bottle containing 1,000 pills. During the lunch hour Mr. Calcote remained in the store in a position where he could observe persons walking up and down the aisle where the particular drugs were stored. He testified that at approximately 12:20 a person whom he identified as Mrs. Willis Virginia Boyd, wife of appellant, passed through the darkened aisle where the pills were stored, and that she was the only person to pass through the aisle during the time he was present. He also testified that Mrs. *168 Boyd's duties with the company did not require her to be in that part of the store where the Syndrox pills were kept. Mr. Calcote testified that immediately after Mrs. Boyd left he took a second inventory of the Syndrox drugs and discovered that two of the original six bottles were missing. Later, Mr. Morrison counted the pills left on hand and confirmed Mr. Calcote's findings.
Detective L.L. Scarborough of the Meridian Police Department testified that at approximately 12:20 on August 30, he observed Mrs. Willis Virginia Boyd as she left the Standard Drug Company and drove away in her car. Detective Scarborough followed her to the parking lot of the Southern Pipe & Supply Company where the appellant was employed. He saw some man walk up to Mrs. Boyd's car while she was parked, but because of the distance and the underbrush between him and Mrs. Boyd he could not positively identify the man. After observing the two for a few minutes, Detective Scarborough returned to the Standard Drug Company. Later that afternoon Detectives Scarborough and A.W. Creel went before Justice of the Peace R.E. Crawford. They made an affidavit before him that they had good reason to believe and did believe that Syndrox methamphetamine pills were concealed in a pickup truck on the Southern Pipe & Supply Company's parking lot and that this truck was listed in the name of Bobby L. Boyd. On the face of the affidavit the following was given as to the reason for their belief:
Information was obtained from two reliable informants. Surveillance of an employee of a drug company.
The record discloses, however, that Detective Scarborough and Detective Creel testified under oath before Justice of the Peace Crawford advising him that some 80,000 Syndrox pills had been stolen from the Standard Drug Company in past weeks. Detective Scarborough related the events which took place in the Standard Drug Company at noon of that day based on information he had received from employees of the company. He also testified before the justice of the peace concerning his surveillance of Mrs. Boyd from the time she left the drug company until she reached the parking lot of the Southern Pipe & Supply Company. Detective Creel signed the affidavit for the search warrant and corroborated the statements of Detective Scarborough. At the trial of appellant, Justice of the Peace Crawford testified that he issued the search warrant based on the information given him in the affidavit and the testimony of the two detectives.
Armed with a search warrant, Detectives Scarborough, Creel, McNair and Brown went to the parking lot of the Southern Pipe & Supply Company. While Detective Creel went inside to arrest appellant, the other three officers proceeded to locate the pickup described in the search warrant. After identifying the pickup Detective Scarborough placed a copy of the search warrant on the seat and proceeded to search the glove compartment of the truck where he found two bottles of the Syndrox methamphetamine pills secluded in a cigarette carton. After Detective Scarborough initialed both bottles which he had found, the appellant was searched and transported to police headquarters.
Mr. E.H. Morrison testified that the two bottles taken from the pickup truck of appellant bore the same lot numbers as those bottles remaining in the company's inventory, and the record further discloses that the pills taken from the appellant were made by the same manufacturer which supplied the Standard Drug Company with the other methamphetamine pills which it stocked. Mr. Eugene W. Rider, an Examiner Chemist for the Federal Bureau of Investigation in Washington, D.C., testified that his examination of the pills taken *169 from the appellant's truck revealed that they were of the amphetamine type drug sold under the trade name "Syndrox" and that they were a central nervous system stimulant commonly called "pep pills."
The appellant did not testify in his own behalf but used four character witnesses who testified that his general reputation in the community in which he lives is good. Any other details essential to a determination of the issues involved in this appeal will be presented during the consideration of these various issues. Although there are eleven assignments of error urged by appellant, these resolve themselves into six categories dealing with (1) the legality of the grand jury; (2) the admission of evidence discovered in the search of appellant's truck; (3) the admission of testimony concerning the alleged commission of a crime by appellant's wife; (4) instructions granted to the State; (5) comments made by the trial judge; and (6) the weight of the evidence relied upon to convict the appellant.

I
Appellant argues that both the grand jury and the indictment against him should be quashed for four reasons: (1) The judge was absent at the time of the drawing; (2) women were systematically excluded; (3) Negroes were systematically excluded; and (4) the jury does not represent a fair cross-section of the county.
By agreement between counsel and the trial court it was stipulated that the testimony given in the case of Davis v. State, 204 So.2d 270 (Miss. Nov. 6, 1967) relating to the selection of the November grand jury, is to be embodied in and made a part of this record. The same agreement governs the records in Northcutt v. State, 203 So.2d 795 (Miss. Oct. 30, 1967), and McLelland v. State, 204 So.2d 158 (Miss. Nov. 6, 1967).
The record discloses that at the May term of court the trial judge found that Negroes had been systematically excluded from jury service in Lauderdale County and as a result quashed all indictments, set aside all convictions, and freed all prisoners who were able to make bond on bondable offenses. At that time the trial judge, in open court, instructed all members of the Board of Supervisors to draw the names of 1500 qualified persons for jury service, following the law which related thereto. The record discloses that in accordance with these instructions each supervisor examined the registration books and selected 300 persons from his district, with names being drawn from each precinct of the district. It was stipulated by counsel that Lauderdale County had a population of approximately 67,119 persons of which 43,635 were members of the white race and 23,464 were members of the Negro race, thus establishing the fact that Negroes constitute 34.9% of the population of the county. The record discloses that pursuant to the court's instructions and the applicable laws, the supervisors made a genuine effort to impartially select prospective jurors irrespective of their race or color. At the time the motion was urged it was stipulated that there was one Negro stitting on the grand jury and that no women had been selected. The record discloses that there were seven Negroes present in court who had been summoned as veniremen and that another Negro had been excused. The lists utilized by the supervisors showed the registrant's age, sex, and district of residence; but there was no indication of race on any of the lists.
Supervisor R.N. McElroy of District 2 selected every seventh name, omitting women, and selected names from each voting precinct in his district. He testified that he had no way of knowing whether the man chosen was white or Negro except that in some instances there was a possibility he would know the individual. He testified also that he had no way of knowing how *170 many Negroes' names were placed in the box.
Supervisor J. Frank Spears of District 3 selected every fifth person on the list from his district who was qualified for jury service. Frequently names of women would constitute the fifth or more numbers and consequently Mr. Spears would occasionally have to go as far as ten names down the list before he could find a qualified person. Mr. Spears testified that he went down the jury list on each precinct and drew names of qualified persons as far as he could tell from the list, excluding women, those over age, and those physically unable to serve. He estimated that ten to fifteen percent of the qualified electors in his district were Negro.
Supervisor Roy Griffin of District 5 selected his names alphabetically, going down the list from precinct to precinct in order to get some names from each precinct, excluding women. Supervisor Griffin stated, as did all the supervisors, that he did not purposely or knowingly exclude or include whites or Negroes in his selection of names. He stated that many of the names drawn were persons he did not know and for that reason he had no idea of their race.
Supervisor Lamar Taylor of District 4 selected every fifth name from the registration books for his district, taking names from each of the precincts in his district. He testified that approximately twenty percent of the qualified registrants of his district were Negro. He excluded those persons over sixty years of age and those physically unable to serve. Other than these, all names selected were placed on the jury list.
Mrs. William S. Wright, supervisor of District 1, also used the fifth name system, excluding women, and chose all persons in order, regardless of race. The circuit clerk, Mr. Preston P. Coleman, estimated that since he had refilled the jury box thirty percent of those appearing for service over a four months period of time were Negroes. He testified that the grand and petit jurors for the circuit court, and the jurors for the chancery and county courts were all drawn from the same boxes.
Sheriff Raymond Davis testified that following the quashing of the jury boxes in May, the new selection of jurors was used for the August term. Sheriff Davis testified that during the August, September, and October terms of court he had been present for the selection of all juries; that the percentage of Negroes on the juries would vary from one week to the next; that some weeks the percentage was from forty to forty-five or maybe fifty percent, while at other times Negroes would constitute twenty-five or thirty percent; and that at the time of the selection of the grand jury in question he personally knew sixty-two of the jurors, eight of whom were Negroes.
County Judge Emerson Harwell testified that since August 1966, when he began using the new venire, there had been a one-third increase of Negro jurors and that he had five Negroes on the jury for one of his eminent domain cases and four on another. On one jury he had seven Negroes, but two of them were excused. Judge Harwell testified that he drew his jurors in the presence of the chancery and circuit clerks and the sheriff and did not know until he appeared in court whether they were Negro or white. The record discloses that there have not been any criminal cases tried in the county court subsequent to the quashing of the jury in May.
A strange interlude occurs subsequent to the testimony of Judge Harwell. On behalf of Garvin Hill, who was tried at the last term of court, the attorney for appellant in the case at bar made a motion to quash the grand jury because women were excluded and the grand jury was improperly drawn. We fail to see any connection *171 between the defendant, Garvin Hill, tried in a former case, and the innocence or guilt of the defendant in the case at bar. The testimony of Preston P. Coleman introduced in behalf of Garvin Hill is irrelevant and should not have been embodied in this record.
An objective study of the testimony of those persons who have the responsibility of selecting a fair and impartial jury convinces us that there was no systematic exclusion of Negroes from the jury, and that there is no merit in appellant's contention that the exclusion of women from the grand jury and petit jury panels deprived him of any constitutional rights. Pendergraft v. State, 191 So.2d 830 (Miss. 1966); State v. Hall, 187 So.2d 861 (Miss. 1966).
Appellant urges that he has been deprived of his constitutional rights because the circuit judge was not present when the jury was drawn; the procedure set out by statute for the selection of juries was not followed; and the jury did not represent a fair cross-section of the county. We hold that the jury did represent a fair cross-section of the county and that the procedure followed by the supervisors, though not letter perfect, nevertheless fails to disclose that there was any intentional systematic exclusion of Negroes from the jury panels. See Harper v. State, 251 Miss. 699, 171 So.2d 129 (1965). We do not feel that the fact the judge was not present at the time of the drawing invalidates the selection of the jury. Mississippi Code 1942 Annotated section 1774 (1956) provides that in the event the judge does not draw in open court in vacation the jurors necessary, the judge shall so direct the clerks of the circuit and chancery courts and the sheriff to draw the jurors for the term of court and make and certify the list thereof. In passing, the appellant does not urge this point in his brief.
There is no merit in the contention of appellant that the failure to comply with section 1766, requiring persons to be selected who are of sound intelligence and judgment and good moral character, has deprived him of his constitutional rights. It would be almost impossible for supervisors in heavily populated areas to know the intelligence, the judgment, or the character of all the qualified electors in his district and the fact that this was not taken into consideration does not invalidate the selection of the jurors. Furthermore, this Court has held this statute to be directional, not mandatory. Tanner v. State, 190 So.2d 670 (Miss. 1966).
The selection of a fair and impartial jury does not require proportionate representation of the races. Harper v. State, supra. Rabinowitz v. United States, 366 F.2d 34 (5th Cir.1966), has no application here for this record fails to show there was any systematic exclusion or inclusion of Negroes.
From the foregoing it follows that the motion to quash the jury was properly overruled.

II
We turn next to the assignment of error referring to the trial court's refusal to suppress the evidence on the grounds that the affidavit for the search warrant failed to allege facts sufficient upon which the justice of the peace could properly conclude that there was probable cause for the issuance of the warrant. The affidavit for the search warrant set forth the basic grounds for the establishment of probable cause as follows: "Information was obtained from two reliable informants. Surveillance of an employee of a drug company." However, it is unnecessary for us to determine whether these words standing alone in the affidavit for search warrant are sufficient to establish *172 probable cause for the reason that Detectives Scarborough and Creel were sworn and testimony was taken by Justice of the Peace R.E. Crawford which, as his testimony discloses, did establish probable cause for the issuance of the search warrant. Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and O'Bean v. State, Miss., 184 So.2d 635 (1960) do not have application here because the magistrate in the case at bar did not accept the mere conclusions of the affiant but based the issuance of the warrant upon the facts and circumstances testified to him by the two detectives. However, the motion to suppress the evidence discovered during the search of appellant's truck should have been sustained. The appellant was present when officer Creel entered the garage. Personal service of the warrant upon the appellant could have been easily obtained, but no service was secured. Though the issue was not assigned or presented in the briefs of appellant it follows nevertheless that the evidence obtained under the search was inadmissible. Miss. Rule 6; Adams v. State, 202 Miss. 68, 30 So.2d 593 (1947).

III
Appellant urges at great length that it was error for the lower court to overrule his objections to the evidence and testimony offered against him by the State which pertained to the alleged commission of a crime by the wife of appellant. Appellant urges that Caldwell v. State, 194 So.2d 878 (Miss. 1967) is controlling insofar as this assignment of error is concerned. In that case Mrs. Caldwell testified against her husband without his consent, which was in violation of the provisions of Mississippi Code 1942 Annotated section 1689 (1956). We stated in that case that what she said or did not say at the time was not competent evidence and that appellant under these circumstances did not waive his objection. In the instant case we do not have a wife testifying against her husband in violation of section 1689. We have a detective testifying as to essential facts in the chain of events which established the issue of fact for determination by the jury as to whether or not the defendant knowingly came into possession of drugs illegally in violation of section 6831-02. By no stretch of the imagination can the actions of the detectives be construed to embody a statement by appellant's wife or constitute an invasion of appellant's rights under section 1689.
In Humphreys v. State, 122 Miss. 41, 84 So. 141 (1920), cited by appellant, the wife voluntarily disclosed to the officers the location in their home of the cotton sack allegedly used by the defendant in stealing and transporting cotton. The wife in the Humphreys case stated to the officers who were searching her home that the sack in question was used by her husband in bringing cotton from the field to the house. Again the facts in the Humphreys case clearly distinguish it from the case at bar. Nowhere in the case at bar did the wife make a statement tending to incriminate or convict the appellant of the offense charged. We do not have any evidence in this case which is tantamount to a confession by the wife of appellant's guilt.
The general rule set forth in Riley v. State, 254 Miss. 86, 180 So.2d 321 (1965) is a salutary one and trial courts should exercise a high degree of caution in admitting evidence of similar offenses. The evidence in this case, however, is not proof of the commission of another crime perpetrated by the accused. The actions of the wife were admissible in evidence for consideration by the jury on the guilt or innocence of the appellant under that indictment.

IV
Appellant urges as error the granting of one instruction to the State. That instruction is as follows:
The court instructs the jury they are the sole judges as to the credibility of *173 witnesses, and, in determining whether witnesses will be believed or not, they are not bound by the opinions of other witnesses, but have a right to consider all the testimony of the case, the motive and the interests of any witness, the nature of his testimony, and all the facts in evidence throwing light upon the point.
A unique interpretation is placed upon this instruction by the appellant, who theorized that by the granting of this instruction the court commented on the silence of the defendant. Such a conclusion is unwarranted. This instruction has been granted by courts in Mississippi for years and never has it been construed as an indirect statement to the effect that the jury should take into consideration the fact that the appellant did not take the stand in his own behalf.

V
Although appellant urges that the trial court committed error in making a prejudicial comment in the presence of the jury about the testimony in this cause, we do not so find. After an objection by defense counsel and a request that the jury be withdrawn the court made the following comment:
BY THE COURT: Gentlemen, go out.
I think the Court will settle this thing once and for all. Step outside gentlemen.
The statement indicates neither that the trial court abused its discretion nor that the words used demonstrated that the trial court favored either the appellant or the appellee.

VI
Finally, appellant urges that the verdict is contrary to the weight of the evidence, with which contention we agree. The testimony establishes beyond peradventure that the State's case rests almost entirely upon circumstantial evidence. Two bottles of the amphetamine pills were found to be missing shortly after Mrs. Boyd passed through the aisle where they were stored. An inventory taken not long before her passage through the aisle revealed no shortages. Mrs. Boyd was followed to the parking lot maintained by the company for which appellant worked, and where appellant parked his truck. This parking lot was used by other employees and persons having business with appellant's employer. While on the lot, Mrs. Boyd was seen talking to an unidentified man. There is nothing in the record to connect Mrs. Boyd and this unidentified man with appellant's truck or to even show that the truck was on the lot at the time Mrs. Boyd was there.
The only circumstance upon which the jury could have founded their verdict was that the pills were subsequently found in appellant's truck, and there is nothing in the record to indicate that appellant knew of the existence of the illegal drugs. Not only must the State prove all the elements of the crime, it must also prove the accused's connection with it. State v. Thornhill, 251 Miss. 718, 726, 171 So.2d 308, 312 (1965). When the State, as here, relies substantially on circumstantial evidence, that evidence "must have been so completely conclusive as to have excluded every other reasonable hypothesis * * *." Westbrook v. State, 202 Miss. 426, 434, 32 So.2d 251, 253 (1947). See also Aven v. State, 246 Miss. 839, 152 So.2d 924 (1963).
We do not believe that the evidence in this case comports with the above standards sufficiently to divest appellant of the protective presumption of innocence with which he is cloaked. Cook v. State, 85 Miss. *174 738, 748, 38 So. 110 (1905). In fact, since the search warrant was not served there is actually no testimony of record on which a judgment of guilt can be sustained against the appellant and for that reason the appellant must be discharged. Adams v. State, 202 Miss. 68, 30 So.2d 593 (1947).
Reversed and appellant discharged.
ETHRIDGE, C.J., and RODGERS, PATTERSON and SMITH, JJ., concur.
ROBERTSON, J., dissents.