## BASS v. STATE

No. 43641 February 7, 1966 182 So. 2d 591

724

February 28, 1966 183 So. 2d 483

*R. Jess Brown,* Jackson; *Melvin L. Wulf, William G. Kopit, Paul Chevigny,* New York, N. Y., for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Jones, J.

This case comes from the Circuit Court of Warren County where the appellant was convicted of rape of a white woman. He was sentenced to death.

We are compelled to reverse the case.

The victim was a white lady 54 years of age who resided alone on Bazinsky Road in Vicksburg. She was employed in one of the stores in the city and on September 9, 1964, after work, returned to her home. The city dump is a short way beyond her house traveling from town. About 10:15 that night she went to bed. Somebody knocked on her front door after she had gone to sleep. When she asked, "Who is it?" he replied by asking the way to Vicksburg. She told him the direction and went back to sleep. Later that night somebody broke through the side door of her house. When she jumped up, he reached in the corner, picked up the victim's rifle and pointed it at her. Then he told her to undress and get in bed; there the act was committed. Afterward, he made her put on her gown. He dragged her to the telephone where he pulled the receiver off, apparently thinking he was pulling it from the wall, but instead he had pulled out a lamp plug. He then took her behind the door through which he had come, threw her to the floor and choked her, and beat her until she was unconscious. She did not know the time when he came nor when he left. Later that morning, having regained conscious-

ness, she went to a neighbor's house and reported what happened. Doctors were called to administer necessary treatment to her. It was about 5:30 A. M. when she went to her neighbor's house.

There is no question as to the commission of the act. The only issue is the identity of its perpetrator.

The prosecutrix testified it was dark, and she could not see the face of the person well enough to identify him. She did know that he was a tall Negro, identifying him as a Negro by his voice, and that he wore a narrow-brim hat. The case was circumstantial. Among the circumstances developed was the fact that appellant was employed by the City, assisting in the hauling of garbage at night. On the afternoon before, he had been in the neighborhood of this house working upon a ditch for another employer. On the night of the alleged assault, he had gone on one trip to the garbage disposal dump; but, on the next trip, he did not go. He had left the truck at a point twenty-five or thirty minutes' walking distance from the prosecutrix's house, explaining to the driver of the truck that he wanted to see his mother and get some money from her. He left the truck. The next time the driver saw him he told the driver that he had not been able to get any money from his mother, and that he had no money. Later, he told another version of his absence from the truck — that he was going to visit a school teacher whom he had met or seen the day before in a grocery store, and he was expecting or hoping to have intercourse with her.

The prosecutrix testified that when she went to bed that night she had a dollar bill and a fifty-cent piece in her purse. Early that morning, one of the policemen, while investigating the case, opened her purse and found only a nickel and one or two pennies. The truck driver said that, when he saw the appellant returning from one of his absences from the truck, he asked him if he wanted to go to town. Appellant requested him to wait until

he got some cigarettes. The man operating the place where the cigarettes were secured testified that appellant came in and asked for change for a fifty-cent piece so he could get some cigarettes from the cigarette machine.

One of the policemen testified that while examining the scene of the crime he found a leather strap, being a part of a bootlace, on the floor just a few feet from the door that had been broken down. When they talked to appellant to ascertain his whereabouts the night before, he was wearing boots.

The appellant voluntarily came to the police station with the police that afternoon and talked with them. When the police talked to the driver of the truck, they ascertained differences in the statements of the appellant. Because of the circumstances which they had learned, to-wit: the description of appellant; the fact that he was in the vicinity; the fact that he was wearing boots with leather boot straps; and the various statements by him, the police arrested Bass at 9:30 P. M., the night after the assault.

After the arrest of appellant, he was brought to Jackson for further investigation. While in Jackson, he was asked by police officers what clothes he wore the night before. According to the police officers, he stated that the pants and shirt which he wore the night before were at his home; and, if they would contact his wife, she would give them to the police. He and his wife were residing at the home of his mother-in-law.

Thereupon, the police in Jackson telephoned the police in Vicksburg, and the officers there went to the home and secured the pants and shirt.

The boots which appellant was wearing were removed from his feet when he was arrested, and it was discovered that one of the boot straps was shorter than the other. The broken piece had already been sent to Baton Rouge for examination by the Louisiana State Policemen's Lab-

oratory. After removal of the straps from the boots, they (the straps) also were sent there.

When the shirt and pants were obtained from appellant's wife, they together with bed clothing and the victim's night clothes, were forwarded to the FBI laboratory at Washington, where they were examined.

The FBI report stated that there was blood on the shirt worn by appellant. When asked about this spot on his shirt, Bass said it was fish blood; that he went to a fish market in Vicksburg, and got the blood on his shirt there. The FBI report showed that it was human blood.

There was also blood found on the bed clothing on which also was a hair of Negroid origin. The blood stain was not sufficient to be classified, nor was the hair sufficient to be identified as one of appellant's.

Human semen was found on the flap of appellant's trousers. The school teacher whom he had told the driver he was going to visit denied making a date with him, and said he was not at her home that night.

The laboratory technician of the Louisiana Police Laboratory testified regarding the shoelaces. He said that, while it was impossible to state positively that this fragment of a shoelace found on the floor was a part of the shoelace in the boot, he could say that there were no circumstances by which he could assert positively that it did not come from that shoelace. The fragment of shoelace, when coupled with the shorter shoelace taken from the boot, made a string approximately three inches longer than the other shoelace. However, the technician testified this could easily occur by reason of the strain and pull on the shoelace at the time it broke.

These were briefly the circumstances in evidence when the state rested.

The rule had been invoked. The prosecutrix had no opportunity to hear Bass talk prior to her appearance on the stand. She did testify that she would be able to

identify the voice of the man if she could hear it. When appellant was on the stand, the prosecutrix returned to the courtroom and listened to him testify. After the defense rested, she was recalled by the state, and over the strenuous objection permitted to testify that she had now heard appellant's voice, and that she could identify his voice as that of the person who attacked her.

There are numerous assignments of error, the first of which is that the lower court erred in failing to sustain a motion to quash the indictment and the special venire because of alleged systematic exclusion of Negroes from the jury list.

On the hearing of this motion, it was shown that the total white male population of Warren County over twenty-one years of age was 6,274, and the total non-white male population over twenty-one was 4,677. Thus, the non-white male population of the county over twenty-one years of age was 42% of the total male population over twenty-one.

It was shown that there were 10,000 or 11,000 qualified electors, of which number approximately 1500 were colored. The appellant introduced evidence that the number of Negroes on the jury lists of the county from the years 1957 to 1964, both inclusive, ran from none in 1957 to six in 1964, and, in the intervening years, the number was less than six. The state introduced three of the supervisors who testified they followed the law in drawing the jury list. The circuit clerk testified to the same effect. The only evidence to conflict in any way with the figures for the years aforestated was a statement by the circuit clerk that for the years 1963 and 1964 there were thirty-five or forty Negroes on the jury list. Assuming that the full 800 jurors which the statute provides to be drawn were drawn for each of these years would mean there were twenty or less colored on the list for each of those years. That would be 2½% of the total list as compared with 42% of the males over twenty-one years of age.

 ██ Two of the supervisors did not testify, and neither did the chancery clerk. There was no attempt by the state to explain the failure of Negroes to be on the list. Those officers who testified simply stated that they drew the list in accordance with the law. This was not sufficient to meet the burden cast upon the state by the prima facie case made by appellant. Decisions bearing upon this case could be cited and copied to make an entire volume, but it has been said so many times that we do not think it necessary to repeat all of these decisions. We simply cite the case of Harper v. State, 251 Miss. 699, 171 So. 2d 129 (1965), where the federal cases and many state cases are collated and described. Our courts and officials charged with the duty of selecting jurors should heed these laws, if we hope to continue to handle violations of our laws. Our courts, whenever facts such as these are shown, can do nothing except reverse.

 The next assignment is the failure of the lower court to grant a peremptory instruction on the ground that the state did not meet its burden of proof. We have given this question much study, and believe that the circumstances, most of which are hereinabove mentioned, are sufficient to go to the jury on the question of the appellant's guilt, even after eliminating some of the evidence or circumstances which may later have to be done under our holdings hereinafter stated.

 The third assignment is the failure of the court to sustain the objection to Mrs. Griffith's testimony in rebuttal after the state rested its case and after, in violation of the rule which had been invoked, the prosecutrix returned to the courtroom to listen to the defendant testify. This should not have been permitted. It was unfair and an undue advantage of appellant. If he had known she was going to return and listen to his voice, he could have declined to testify. ██ Under all of the circumstances, it was an abuse of the trial court's discretion to permit this testimony in rebuttal.

██ ██ The next assignment is that the court erred in limiting defendant's cross-examination of certain policemen about matters regarding their actions and the way they proceeded in the investigation. On the subject of cross-examination, this Court said in Prewitt v. State, 156 Miss. 731, 735, 126 So. 824, 825 (1930):

> It is of the utmost importance in the administration of justice that the right of cross-examination be preserved unimpaired. It is the law's most useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective. In this state, cross-examination is allowed coextensive with the issues, Walton v. State, 87 Miss. 303, 39 So. 689; not only, but it may proceed into the collateral circumstances surrounding, or in any way affecting, the transaction to the full extent that they have relevant connection by way of testing the memory, accuracy, sincerity, interest, or bias of the witness. In all these matters the privilege of counsel rightfully has broad latitude, and, to make it fully effective towards the purposes for which the law allows and favors it, the privilege should not be interfered with or hampered or restricted by the trial judge, except in clear case of irrelevancy, trespass beyond admissible ground, or extremes of continual, aimless repetition. 1 Thomp. on Trials, sections 406, 415-419. In several instances in this record, as it appears to us, the privilege was unduly and materially embarrassed by the trial judge; and this feature, taken together with the error first mentioned, makes it our duty, as we view it, to reverse the judgment and remand the case for a new trial.

We are of the opinion that the court should have permitted the cross-examination to proceed fully.

██ ██ Another question pertains to the failure of the court to allow the entire FBI written report, made to the police department of the City of Vicksburg, to be

read to the jury. The state introduced two FBI laboratory technicians who testified as to the particular work they had done; and, when questioned about the report, they pointed out two or three paragraphs which included their individual examination. There were three short paragraphs at the end of their report which appellant says were favorable to him. As stated, the state introduced the witnesses who had made only the examinations about which they testified. That part of the report appellant wanted to be read to the jury was made by other persons who were not offered as witnesses. The state did not introduce the FBI report. It simply introduced two men who had examined part of the articles. The court sustained the state's objection to this report, and particularly that part not made by the witnesses, as being hearsay. We think this was correct.

A merchant testified that he sold the defendant a pair of leather shoelaces a few days before the assault. He did not know the exact date. He was introduced by the defendant, whose counsel undertook to prove by him that he talked to the police right after the occurrence and told them that the purchase was just a couple of days before the assault. But the witness did not remember the time. He said he talked to the policemen, and told them that he sold the laces to the defendant within a few days. There was no error as to this testimony.

The police a few hours after knowledge of the crime, requested appellant to accompany them to the police station, which he did voluntarily. There he was not a suspect upon whom the investigation had begun to focus. This was a general inquiry. He was arrested about 9:30 P. M. that night and carried to Jackson for what is commonly called a "lie detector" test. At Jackson, he was asked about the clothes he wore. He, according to the police, described the clothes he wore the night before, and said if they would go to his home his wife would give them the clothes.

At no time was he advised of his right to counsel or to remain silent.

Error is charged in failure to exclude statements by Bass and other evidence taken from him without telling him of his right to counsel, or to remain silent, and in admitting the clothes obtained from the house as a result of the conversations in Jackson.

 █ █ We hold that statements obtained from appellant at the general inquiry at the police station before his arrest were clearly admissible. Appellant insists, however, that the clothes gotten at his home, after he, according to the policemen, had consented to their securing same, were illegally seized. That the permission obtained from him was inadmissible under Escobedo v. Illinois, 378 U. S. 478, 84 Sup. Ct. 1758, 12 L. Ed. 2d 977 (1964).

We cannot agree with this inasmuch as we do not think that case applies to the facts here. We are of opinion the question is whether in truth and in fact the statements were freely and voluntarily given. Compare Henry v. State, 253 Miss. 263, 154 So. 2d 289 (1963).

On retrial, when and if the state offers to introduce such testimony, we suggest the court should, in the absence of the jury, have a full and complete hearing on the issue and determine whether the permissions and statements were freely and voluntarily given and therefore admissible, together with the clothes.

 █ It is alleged the court committed error by admitting in evidence the boots and shoelaces which were obtained by the police as a result of an alleged illegal arrest. With this assignment, we cannot agree. A felony had been committed and, as shown by the above statement of facts, it is apparent that police had probable cause to arrest defendant and, █ after having arrested him, to secure these boots, shoelaces, etc.

For the reasons hereinbefore stated, this case is reversed and remanded for a new trial.

Reversed and remanded.

All Justices concur.

## ON SUGGESTION OF ERROR

Smith, Justice:

This case was reversed and remanded for reasons set out in an opinion of this Court delivered on February 7, 1966, and not yet reported.

The appellant has now suggested that the Court erred in remanding the case for a new trial, and should have given judgment here discharging him. The suggestion of error is based upon a statement in the opinion that the trial court erred in admitting, in rebuttal, testimony by the victim identifying appellant by his voice. It is argued that we held this testimony to be incompetent and that without it the evidence against appellant is wholly circumstantial, and insufficient to exclude every reasonable hypothesis except that of guilt.

Appellant is in error in his construction of the Court's opinion with respect to the testimony offered. It was not decided that this testimony was incompetent, but only that testimony identifying appellant as the attacker was part of the prosecution's case in chief and that it was error to permit it to be introduced in rebuttal.

The suggestion of error is overruled.

Suggestion of error overruled.

All Justices concur.