Jewell B. RAIFORD, Alvie James Walker, and M. H. Magee, individually and on behalf of those similarly situated, Plaintiffs,

v.

Preston P. DILLON, J. L. Conerly, Johnie Stringer, Travis Alford, and Buford Boyd, as members of the Board of Supervisors of Walthall County, Mississippi, Honorable William H. Watkins, Jr., as Circuit Court Judge of Walthall County, Mississippi, Russell B. Slater, as Sheriff of Walthall County, Mississippi, Joe M. Stinson, as Clerk of the Circuit Court of Walthall County, Mississippi, and Denver Kennedy, as Clerk of the Chancery Court of Walthall County, Mississippi, Defendants.

Civ. A. No. 2256.

United States District Court
S. D. Mississippi,
Hattiesburg Division.

March 10, 1969.

Robert B. Fitzpatrick, L. A. Aschenbrenner, William Miller, II, Martha Wood, Jackson, Miss., for plaintiffs.

Breed O. Mounger, Tylertown, Miss., Will S. Wells, Jackson, Miss., for defendants.

NIXON, District Judge.

Plaintiffs brought this suit as a class action against members of the Walthall County Board of Supervisors and other county officials who participate in jury selection, seeking an injunction to bar the defendants from alleged discriminatory practices resulting in underrepresentation of Negroes on Walthall County juries.

The parties stipulated that for twenty years prior to 1965 no Negroes were placed on the jury rolls in Walthall County, nor did a single Negro serve on a Walthall County jury. The stipulation specified that the master jury lists for 1966 and 1967 contained the names of Negroes in the proportions of 10% and 14%, respectively. The master list for 1968 included Negro representation of 27.5%, and a second list drawn in 1968 —after women were given the right to serve on juries by the Mississippi legislature [1]—had Negro representation of 23%.

The parties further stipulated that the jury selection method employed by the Board of Supervisors for selection of the April, 1968, master jury list consisted of selection of every fifth name appearing in the poll books and one person from line seven of each page of the land assessment rolls. A similar random selection method was followed in December, 1968, when every sixteenth name in the poll

1. House Bill No. 895, General Acts of Regular Legislative Session 1968, State of Mississippi.

books and one person from line twelve of each page of the land assessment rolls were selected for the master jury list. This random method of selection was adopted by the Board of Supervisors "to assure that [the jury] list would fairly contain an adequate cross-section and a fair sample of the entire community and * * * to provide a system of selection that would not result in the failure to include any group or class of qualified citizens * * * " [2]

The parties stipulated that total voter registration in Walthall County was as follows:

| Date | Total Registration | White | Negro | Percentage Negro |
|---|---|---|---|---|
| Jan. 1, 1964 | 5100 | 5097 | 3 | .06% |
| March 15, 1965 | 5211 | 5204 | 7 | .13% |
| July 1, 1966 | 6469 | 5215 | 1254 | 19.4% |
| March 31, 1967 | 6771 | 5334 | 1437 | 21.2% |
| March 31, 1968 | 7281 | 5470 | 1811 | 24.9% |
| December 1, 1968 | 7457 | 5584 | 1873 | 25.1% |

Testimony was presented by a witness for the plaintiffs that the other juror source list utilized by the county, the land assessment rolls, was composed of 18% Negroes and 82% whites. These percentages were an estimate by that witness, Dr. Laurence B. Morse, whom the plaintiffs attempted to qualify as an expert in statistical analysis. Dr. Morse received a doctorate degree in economics from the University of Minnesota in 1968 and has been a professor at Tougaloo College in Jackson since September, 1968. For the purposes of this opinion, the Court will recognize the percentage composition of the land assessment rolls estimated by Dr. Morse. However, no basis for such an estimate was offered in evidence and the Court regards the percentages testified to as, at best, a guess.

The United States Census of 1960 revealed an adult population in Walthall County of approximately 65% whites and 35% Negroes, and testimony by Dr. Morse indicated that such percentages were approximately accurate for Walthall County as of the time of trial. The Court will accept those percentages for the purposes of this opinion.

In seeking injunctive relief, the plaintiffs raise two arguments: (1) that because of a long history of racial discrimination in jury selection in Walthall County, an injunction is required absent a finding that the defendants have abandoned past illegal practices and that no reasonable expectation of future impropriety exists; and (2) that the random selection method currently employed by the Walthall County Board of Supervisors is constitutionally invalid for failure to achieve juries which are fairly representative of a cross-section of the community. Since an injunction would be required in any event if the plaintiffs' second argument is meritorious, the Court will deal with that question first.

I.

Dr. Morse testified that, given the two sources for jurors utilized in Walthall County, the chances for a master jury list containing 35% Negroes were "practically nil." The Court seriously doubts, and does not accept, this assertion. While Negro voter registration as of December 1, 1968, was 25.1% of total registration, the percentage of Negro registration has increased steadily

2. "Order Selecting List for Jury Service in Walthall County, 1968–69" by Walthall County Board of Supervisors, May 24, 1968. Plaintiff's Exhibit No. 5.

in Walthall County since implementation of the Voting Rights Act of 1965.[3] The Court was offered no evidence as to why that trend should not and would not continue. The Voting Rights Act contains ample safeguards to prevent denial of registration to Negroes;[4] indeed, plaintiffs do not assert that Negroes are deterred from registering to vote in Walthall County. Moreover, while the Supreme Court has repeatedly held that the systematic exclusion of any "definable class" from jury service is a denial of equal protection of the law,[5] proportional representation of such classes on a particular jury panel or venire is not required.[6] As the Supreme Court said in Swain v. Alabama:

> Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group.[7]

What the Constitution condemns is purposeful discrimination, and the burden is on the plaintiffs to prove the existence of such discrimination.[8] In the Swain case, the Supreme Court did not find that purposeful discrimination was established by a showing that an identifiable group was underrepresented by as much as 10%.[9] Accepting the 35% figure as the accurate percentage of Negroes in Walthall County, Negroes were underrepresented on juries in that county by 7.5% on the master jury list drawn in April, 1968, and by 12% on the master list drawn in December, 1968. This Court is not prepared to find that plaintiffs have met their burden of establishing purposeful discrimination in light of those figures.

The Court does not mean to indicate that it considers the jury exclusion question to be a game of figures, nor does it read Swain as establishing 10% as a permissible limit of exclusion. The Court would agree with plaintiffs that 35% Negro representation on the master jury lists is the optimum situation. However, at some point practical considerations must play a role in the jury selection process. The incontrovertible fact is that there is no comprehensive source list available for use in jury selection which accurately reflects the percentage composition of a community. City directories are not always available and do not include non-city residents; telephone books, utility customer records, and local tax lists have an economic basis and tend to underrepresent low-income groups; census records, while comprehensive, quickly become outdated.[10] Congress found itself faced with this problem during deliberations on the Jury Selection and Service Act of 1967, and resolved the problem by resort to the voter registration lists.[11] Former Attorney General Ramsey Clark, testifying

---

3. See the figures on Walthall County voter registration cited in the text, *supra*.

4. *See* 42 U.S.C. sec. 1973d.

5. A long line of cases has adhered to this principle since its first enunciation in Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880). *See, e. g.*, Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964) ; Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958) ; Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947) ; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935).

6. *See, e. g.*, Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ; Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

7. 380 U.S. at 208, 85 S.Ct. at 829.

8. Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) ; Akins v. Texas, 325 U.S. 398, 400, 65 S. Ct. 1276, 89 L.Ed. 1692 (1945) ; Tarrance v. Florida, 188 U.S. 519, 520, 23 S.Ct. 402, 47 L.Ed. 572 (1903).

9. "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%." 380 U.S. at 208–209, 85 S.Ct. at 829.

10. See the excellent discussion of this problem in 20 Vand.L.Rev., 910, 915 (1967). *See also* S.Rep. No. 891, "Improved Judicial Machinery for the Selection of Federal Juries," 90th Cong., 1st Sess. 16 (1967).

11. *See* 28 U.S.C. sec. 1863(b) (2).

before the Senate Judiciary Committee on behalf of the Johnson Administration said:

> "We looked at every type of list we could find. We looked at post office addresses, at Civil Service Commission lists, at Social Security lists, and we considered telephone books, and a city directory sort of list, and we couldn't find any list that would be across the country nearly as good as the voter list." [12]

Senator Joseph Tydings of Maryland asserted that voter lists "provide the widest community cross section of any list readily available." [13] Not only do voter registration lists represent the best source lists available, their use as a juror source has been judicially sanctioned by the Fifth Circuit. In Grimes v. United States that Court noted in a per curiam opinion that "a group of persons who have failed to register to vote has never been considered to constitute a 'cognizable group'" within the meaning of those decisions holding it a denial of equal protection if such a group is inadequately represented in the jury selection process.[14] In fact, this Court considers the voter lists as a source highly likely to result in the selection of individuals interested in the public welfare in a manner which makes them desirable jurors. As former Attorney General Clark indicated: "[There is] some relationship between the public interest that would cause a person to register to vote, and jury service." [15]

■ Of course an appropriate source list in itself does not obviate discrimination. In Whitus v. Georgia, for example, the Supreme Court expressed concern not so much with the tax digests utilized as a source for juror names, as with the fact that under the system employed "the opportunity for discrimination was present" and the Court was unable to say that discrimination "was not resorted to by the commissioners." [16] The Walthall County selection system affords no opportunity for discrimination. The Board of Supervisors uses the same principle in selection of master jury lists as is employed under the new Federal jury selection plan, that is, random selection.[17] The supervisors exercise no discretion in the selection process.

■ The addition of the land assessment rolls [18] as a second juror source does not defeat the selection plan. In Roach v. Mauldin the Fifth Circuit considered the tax digest source utilized by Georgia and noted that "in the absence of racial considerations the use of tax digests, which necessarily exclude non-property owners, seems to have been settled as not prima facie unconstitutional." [19] Of course the land assessment rolls utilized by Walthall County, like the tax digests used in Georgia, exclude

12. S.Rep. No. 891, 90th Cong., 1st Sess. 16 (1967).

13. Id.

14. 391 F.2d 709, 710 (5th Cir. 1968).

15. Hearings Before the Subcomm. on Improvements in Judicial Machinery, 90th Cong., 1st Sess. 43 (1967).

16. 385 U.S. at 552, 87 S.Ct. at 647.

17. See Statement of the policy of the Federal Jury Selection and Service Act of 1967 expressed at 28 U.S.C. sec. 1861.

18. Use of the land assessment rolls as a juror source is sanctioned by Miss.Code Ann. sec. 1762–01 (Supp.1966), which was enacted by the legislature in 1964. It requires a court order for addition of such rolls to the sources available for selection of jurors. The Circuit Judge for Walthall County entered such an order on January 12, 1965. Miss.Code Ann. sec. 1762–03 (Supp.1966), makes clear that the only sources which members of the Board of Supervisors are authorized to use in the selection of jurors are voter registration lists and the land assessment rolls. Use of the latter source is authorized only when an order is entered by the circuit judge pursuant to Miss.Code Ann. sec. 1762–01 (Supp.1966).

19. 391 F.2d 907, 908 (5th Cir. 1968). The Court cited Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), where the Supreme Court noted the problem of finding a comprehensive source for use in juror selection, and approved a tax list used as juror source since it was the most comprehensive list available short of a census or required registration. Of course the Courts cannot conduct a census every time a jury is to be selected.

nonproperty owners. Even were the land assessment rolls the only source used by Walthall County, this Court would not feel compelled to find such a source productive of unconstitutional juries. There has been no showing of purposeful discrimination in the use of such rolls; indeed, the choosing of names from the assessment rolls is by random selection. Even assuming that Negroes are underrepresented on the land assessment rolls, which the Court does not consider as established by the evidence, such underrepresentation from that source is offset by the use of the voter registration lists.

■■ The Mississippi legislature has seen fit to sanction the use of land assessment rolls as a source for jurors by statute. It is not for this Court to quibble with the policy of the State of Mississippi absent a finding that such policy is unconstitutional. This Court is not convinced that use of the land assessment rolls in Walthall County as a source for jurors is violative of the Constitution; it would transgress the principles inherent in our federal system to enjoin the use of such land assessment rolls absent a finding of unconstitutionality.

## II.

The plaintiffs raise a closer question as to whether an injunction should issue despite cessation of any illegal acts on the part of the defendants in the past. The Fifth Circuit has recently dealt with this problem in Pullum v. Greene, 396 F.2d 251 (5th Cir. 1968). Relying on the Supreme Court decision in United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the Court said the law is "certain that voluntary cessation of the allegedly illegal conduct deprives a tribunal of neither the power to hear and determine the case nor the power to grant injunctive relief." [20]

In *Pullum,* the Fifth Circuit reversed the District Court's denial of an injunction although it was alleged that the jury

selection system in question had been revised to meet constitutional commands. It apparently had not. As the Fifth Circuit said of the revised selection method: "the jury commissioners used the same segregated tax digest again and added Negroes to the extent that Negroes constituted some 17.9% of the grand jury list and 21.7% of the traverse list. Statistically the percentage bears little relation to the percentage of Negroes on the tax digest and to the 55.5% Negro population." But in the case at bar the revised selection method clearly meets constitutional commands. The supervisors used no segregated source list, as was used in *Pullum;* the method utilized was random selection so that the possibility of purposeful discrimination was entirely eliminated; and the percentages of Negroes chosen for the master jury lists under the revised method, 27% and 23.5%, bore a definite statistical relation to the assumed 35% Negro population in Walthall County, as was not the case in *Pullum.*

The leading case on the question of whether an injunction should issue after alleged illegal activities have ceased is the *Grant* case, *supra,* relied upon by the Fifth Circuit in *Pullum.* The Supreme Court there stated that a case under such circumstances may be moot "if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" While noting that the burden of proving no reasonable expectation of repeated illegal conduct is a "heavy one," the Supreme Court nonetheless said:

But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The [judge's] decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the

---

20. 396 F.2d at 256.

bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of the past violations.[21]

After carefully considering all the circumstances in this case, the Court is not satisfied that the moving party has established that relief is needed. The Walthall County Board of Supervisors has adopted a random plan of juror selection which completely eliminates the possibility of purposeful discrimination. The Court views no "cognizable danger of recurrent violation." The current Walthall County plan leaves no room for human discretion. Moreover, the growing number of reversals of criminal convictions—in the Mississippi courts [22] as well as the federal courts on habeas corpus [23]—because of illegally constituted juries dictates that all public officials involved in the jury selection process take the utmost care to devise a selection mechanism which is constitutionally sound. The members of the Walthall County Board of Supervisors are obviously aware of their responsibility in this regard and have carefully devised a jury selection plan patterned on the same principles utilized in the federal jury selection system. This Court is convinced that there is nothing more than a "mere possibility" that future violations may occur.

■ In United States v. Atkins, 323 F.2d 733, 739 (5th Cir. 1965), and again in *Pullum*, the Fifth Circuit emphasized the three factors cited by the Supreme Court in *Grant* as relevant to whether an injunction should issue under the circumstances present in the case at bar, that is, (1) "the bona fides of the ex-

pressed intent to comply"; (2) "the effectiveness of the discontinuance"; and (3) "in some cases, the character of the past violations."

■ The Court finds that the defendants here are bona fide in their intention not to allow future violations. Indeed, the possibility that a substantial number of the criminal convictions within the county may be subject to reversal absent strict adherence to constitutional commands in the jury selection procedure demands that the officials involved make every effort to assure that future violations do not occur. The Court also finds that the discontinuance of violations in this case is effective. The new selection method removes any opportunity for purposeful discrimination and is in fact capable of producing juries which proportionately reflect the Negro and white percentages in the community.

The character of past violations is admittedly flagrant, but this is one of the cases—apparently contemplated by the Supreme Court in *Grant* [24]—when such a factor is of lesser importance. The spectre of criminal case reversals alone constitutes a changed circumstance which would likely have curbed past violations long ago. Furthermore, prior to the Voting Rights Act of 1965 the defendants and their predecessors in office were without power to increase the percentage of Negroes serving on juries in Walthall County. The Mississippi law names two sources for juror names—voter registration lists and land assessment rolls. In March, 1965, only seven Negroes were registered to vote in Walthall County, and it was not until Janu-

---

21. 345 U.S. at 633, 73 S.Ct. at 898.

22. *See, e. g.,* Williams v. State, Miss., 210 So.2d 780 (1968) ; Harris v. State, Miss., 206 So.2d 829 (1968) ; Watts v. State, Miss., 196 So.2d 79 (1967) ; Shinall v. State, Miss., 187 So.2d 840 (1966) ; Black v. State, Miss., 187 So.2d 815 (1966) ; Bass v. State, 254 Miss. 723, 182 So.2d 591, 183 So.2d 483 (1966) ; Harper v. State, 251 Miss. 699, 171 So. 2d 129 (1965).

23. *See, e. g.,* Whitus v. Georgia, *supra* ; Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966) ; Ellzey v. Breazeale, 277 F.Supp. 948, 950 (S.D.Miss.1967) (Russell, J.).

24. The Court in *Grant* noted that *"in some cases,* the character of the past violations" is to be considered regarding whether an injunction should issue although the illegal activities sought to be enjoined have been discontinued. 345 U.S. at 633, 73 S.Ct. at 898 (Emphasis added).

ary 13, 1965,[25] that the supervisors were authorized to utilize the land assessment rolls as a juror source.

In conclusion, the Court holds (1) that there is no reasonable expectation of future violations of constitutional commands as to jury selection procedures in Walthall County; and (2) that the random selection method of jury selection currently employed by Walthall County results in the selection of juries which are fairly representative of a cross-section of the community. The plaintiffs having failed to show the necessity for issuance of an injunction, their request therefor is denied. A judgment accordingly may be presented to the Court.

25. Note that the statute which authorized utilization of the land assessment rolls as a juror source was not passed until 1962. Miss.Code Ann. sec. 1762–01 (Supp.1966). Until passage of that statute and the ensuing order implementing it in Walthall County, the defendants were limited by statute to persons registered to vote in Walthall County, of whom, on January 1, 1964, only three were Negroes; on March 15, 1965, only five were Negroes.