# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-KA-01101-SCT

*JONTAE MORRIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/1998 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WHITMAN D. MOUNGER |
| | WILLIAM C. TROTTER, III |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  DEWITT T. ALLRED, III |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 5/11/2000 |
| MOTION FOR REHEARING FILED: | 5/26/2000; denied 2/22/2001 |
| MANDATE ISSUED: | 3/1/2001 |

## BEFORE PITTMAN AND BANKS, P.JJ., AND COBB, J.

## PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. This is an appeal from the Circuit Court of Holmes County where the defendant, Jontae Morris ("Morris"), was convicted of the capital murder of Sam Brown ("Brown"). Morris was sentenced to life imprisonment without the possibility of parole.

### STATEMENT OF FACTS

¶2. On June 6, 1997, Morris and Anthony Hicks ("Hicks") were indicted for the capital murder of Brown. Morris, who was arraigned on July 23, 1997, pled not guilty to the charge of capital murder. The Circuit Court of Holmes County severed the trials of Morris and Hicks.

¶3. Morris went on trial May 13, 1998. He was found guilty of capital murder and sentenced to life imprisonment, without the possibility of parole, in the custody of the Mississippi Department of Corrections.

¶4. Sam Brown owned and operated a convenience store in Lexington, Mississippi. Testimony at trial established that shortly before 10:00 p.m. on January 28, 1997, two men entered Brown's convenience store. Brown, who was in the back of the store, came to the front and waited on the two men. Brown then

returned to the back of the store.

¶5. Shortly after the two men left the store, someone entered the store and told Robert Bevill ("Bevill"), a friend of Brown's who was in the store, to lie on the floor. When he protested, one assailant fired a shot. Bevill then did as he had been told.

¶6. Bevill testified that both assailants, one of whom wore a mask, were black males, one tall and one short. He was sure that both had been in the store earlier that evening. Bevill also testified that he heard several shots, followed by Brown moaning and saying "no" and "don't do it." Bevill then got up and found Brown, who had been shot, lying in the doorway. He tried to call for help, but the phone had been ripped from the wall. Bevill finally ran into the street for help.

¶7. Grady Mayberry ("Mayberry") was an employee of Brown's who worked the 2:00 p.m. to 9:00 p.m. shift that day. He testified that Brown always stacked the money in the register face up with the faces pointing in the same direction. Mayberry testified that as he was getting ready to end his shift at 9:00 p.m., two men entered the store and made a purchase. Mayberry identified Morris as one of the men. Mayberry testified that while he was waiting for his car to warm up in the parking lot, he saw Morris and Hicks drive away in a van.

¶8. Joseph Head ("Head") was the first police officer on the scene. Head testified that he was flagged down as he drove through Lexington. He found Brown lying at the front door of the store.

¶9. Lexington Police Chief Jessie Joiner ("Joiner") testified that he found money scattered on the floor between the counter and front door. He also testified that there was blood inside and outside the store. Joiner found bullet holes inside the store as well as a spent bullet. Joiner turned the bullet over the Mississippi Highway Patrol Investigators Wayne Miller ("Miller") and Tim Pyles ("Pyles").

¶10. After interviewing several witnesses, Joiner, Sheriff's Deputy Oliver Williams ("Williams"), Miller, and Pyles went to a house near Arcona to find Morris. Williams had an arrest warrant for Morris that had been issued by the Tchula Police Department on a charge of grand larceny. When the officers arrived at the house, the owner of the house, Annie Hicks, gave the officers permission to enter and search the home. In the home the officers found Morris in bed. Morris refused to identify himself. Next to the bed the officers found a pair of black jeans which Morris admitted were his. In the front pocket, the officers found money which was all stacked face up with the faces turned the same direction. The jeans' pocket, as well as the money in the pocket, appeared to be stained with blood. The officers found Hicks on the sofa with a .25 caliber automatic pistol in his possession. The officers also found a black ski mask at the home. Pyles testified that a .38 caliber handgun was later found at the home of Morris's grandfather, Jack Carey.

¶11. Morris, in his interview with the police, said that he had won the money in a crap game in Tchula. Morris stated that he had played with several friends, Chris, Ricky and T, but the police were unable to identify those people. Morris then told police that he and Hicks had been in Brown's convenience store around 9:00 p.m. Morris said that Hicks had been buying candy for Hicks' baby. After leaving the store, Morris told officers that he and Hicks had gone to Pam Wade's ("Wade") house to deliver the candy. Morris stayed in the van while Hicks went inside. Morris and Hicks left Wade's home and returned to Morris's house where they watched movies. Sometime after midnight, they went to Hicks's house and went to sleep.

¶12. Wade, whose apartment was located about one-half mile from Brown's store, confirmed that Hicks had arrived at her house around 9:45 p.m. and stayed for about 15 minutes. Wade testified, however, that she did not see Morris that night.

¶13. Paradmedic Richard Stewart ("Stewart") testified that Brown told him that "Jack Carey's grandson" shot him. Stewart testified that Brown made him repeat the information. Stewart called the Lexington Police Department and told them what Brown had said to him. Stewart testified that Brown was in critical condition from the time of the shooting until Stewart delivered Brown to the University Medical Center in Jackson where Brown died 29 days later.

¶14. Rita Brown, Brown's widow, testified that Brown also told her that "Jack Carey's grandson" shot him. Testimony showed that the only two grandsons of Jack Carey were Morris and his brother, Zachary Morris. Zachary was incarcerated at Oakley Training School at the time of the murder.

¶15. Jamie Bush, of the Mississippi Crime Laboratory, testified that the only latent print of value found on the cash drawer belonged to Bessie Robinson, an employee of Brown. Bush testified that he found no prints on the cash drawer that belonged to Morris.

¶16. Dr. Steven Hayne, the state pathologist, testified that Brown received two gunshot wounds with the shot to the back being fatal. Hayne removed a large caliber bullet from that gunshot wound and submitted it to the Mississippi Crime Laboratory.

¶17. Steven Byrd, a forensic scientist with the Mississippi Crime Laboratory, testified that the bullet retrieved from Brown bore the same markings as another bullet fired from the .38 caliber gun found at Morris's grandfather's house.

¶18. Jenny Pritchard, a bio-chemist with the Mississippi Crime Laboratory, testified that she examined several of the bills that were found in Morris's pocket and that they tested positive for the possible presence of human blood. Pritchard also testified that the front pocket on the jeans that Morris admitted owning tested positive for human blood. There was, however, no possible presence of blood found on the knit ski cap.

¶19. Kelly Franovich, DNA analyst for the Mississippi Crime Laboratory, testified that she extracted DNA samples from the front jeans pocket of Morris's jeans. Franovich testified that the DNA she found matched both Morris and Brown. She testified that it would not be unusual to find DNA from the owner, in this case Morris, of the clothing. Franovich testified that Brown was the major donor of the DNA she found. She noted that, statistically speaking, only 1 in 474,000 Caucasian men (as was Brown) would have this genetic profile, and only 1 in 1,820,000 African-American men (as is Morris) would have the same genetic profile.

¶20. Julie Golden, a DNA analyst, also testified. Golden had been hired by Morris's defense to conduct an independent DNA analysis. She testified that the sample from Morris's jeans contained DNA from two donors. Golden's testimony was consistent with that of Franovich: the major donor was Brown and the minor donor was Morris.

¶21. After Golden's testimony, the State rested. The defense then made a motion for a directed verdict, which was denied by the trial court. After Morris refused to testify, the trial court conducted a *Culberson* inquiry of Morris. *Culberson v. State*, 412 So.2d 1184 (Miss.1982). The defense then rested, and the case went to the jury. The jury convicted Morris of capital murder and sentenced him to life in prison

without parole.

## STATEMENT OF ISSUES

**I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A DIRECTED VERDICT OF AN ACQUITTAL AT BOTH THE CONCLUSION OF THE STATE'S CASE AND CONCLUSION OF THE DEFENSE, AND LIKEWISE, ERRED IN OVERRULING APPELLANT'S MOTION FOR A NEW TRIAL OR FOR A JUDGMENT NOTWITHSTANDING THE VERDICT, AS SUCH VERDICT WAS CONTRARY TO THE LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**II. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION IN LIMINE TO LIMIT TO ONE THE NUMBER OF WITNESSES ALLOWED TO TESTIFY TO DYING DECLARATIONS.**

**III. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.**

**IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING, OVER DEFENDANT'S OBJECTION, THE DRAWING OF A SECOND BLOOD SAMPLE FROM THE DEFENDANT.**

**V. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION IN LIMINE REGARDING CERTAIN DYING DECLARATIONS OF THE DECEDENT.**

**VI. WHETHER THE TRIAL COURT ERRED IN ADMITTING AUTOPSY PHOTOGRAPHS WHICH HAD NOT BEEN DELIVERED TO DEFENSE COUNSEL IN DISCOVERY AND WHICH PHOTOGRAPHS HAD NO PROBATIVE VALUE.**

**VII. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING A DEFENSE INSTRUCTION OF ALIBI WHICH PREVENTED APPELLANT FROM PRESENTING HIS THEORY AND GROUNDS OF DEFENSE.**

**VIII. WHETHER REVERSIBLE ERROR WAS COMMITTED BY THE CUMULATIVE EFFECT OF THE PROSECUTOR'S IMPROPER CLOSING ARGUMENT TO THE JURY.**

## DISCUSSION OF LAW

**I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A DIRECTED VERDICT OF AN ACQUITTAL AT BOTH THE CONCLUSION OF THE STATE'S CASE AND CONCLUSION OF THE DEFENSE, AND LIKEWISE, ERRED IN OVERRULING APPELLANT'S MOTION FOR A NEW TRIAL OR FOR A JUDGMENT NOTWITHSTANDING THE VERDICT, AS SUCH VERDICT WAS CONTRARY TO THE LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

¶22. Morris contends that the verdict was against the overwhelming weight and sufficiency of the evidence.

After the State rested its case, Morris made a motion for a directed verdict, which was denied by the trial court. Morris offered no evidence in his defense.

¶23. A motion for directed verdict challenges the legal sufficiency of the evidence offered to that point of trial to sustain a guilty verdict.

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence-not just that supporting the case for the prosecution-in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Brooks v. State*, 748 So.2d 736, 744 (Miss. 1999)(quoting *Bailey v. State*, 729 So.2d 1255, 1263 (Miss. 1999) (citations omitted)).

¶24. Morris was indicted for the crime of murder while engaged in armed robbery in violation of Miss. Code Ann. § 97-3-19(2)(e). The State offered numerous witnesses during trial to prove its case against Morris. Testimony at trial established that:

> (1) Jack Carey was known to have two grandsons: Jontae Morris and Zachary Morris. At the time of the shooting, Zachary Morris was in Oakley Training School.

> (2) Morris was seen in Brown's store between 9:00 and 9:30 p.m. on the night of the shooting and was possibly one of the men who entered the store mere minutes before the robbery.

> (3) Shots from at least two guns, possibly a .22 caliber handgun and a .38 caliber handgun, were fired during the robbery. Hicks was found the night of the robbery with a .25 caliber automatic pistol in his possession. A .38 caliber handgun was later found at the home of Morris's grandfather, Jack Carey.

> (4) The bullet retrieved from Brown after his death bore the same markings as another bullet fired from the .38 caliber gun found at Morris's grandfather's house.

> (5) The cash register box, along with some cash, was lying next to the door of the store. Money was scattered on the floor between the front door and cash register, indicating a struggle had occurred.

> (6) Brown always kept his cash stacked face up with the faces pointing the same direction. The money found in the pocket of the black jeans belonging to Morris was found stacked face up with the faces pointing the same direction. Further the money tested positive for the possible presence of human blood.

> (7) Blood was found on the front pocket of the jeans belonging to Morris. The pocket of the jeans was tested, and DNA from two donors was found. It was determined that Brown was the major donor and Morris, the weak donor.

(8) Brown told Paramedic Stewart on the way to the hospital that "Jack Carey's grandson" was the one who shot him. Brown also told his wife numerous times that "Jack Carey's grandson" is the one who shot him.

¶25. In addressing circumstantial evidence, this Court stated in ***Brown***:

All elements of the crime must be proven by the State, as well as the defendant's connection with the same. Id.; Talbert v. State, 347 So.2d 352 (Miss.1977); Boyd v. State, 204 So.2d 165 (Miss.1967) . Furthermore, the burden of proof of the State in a circumstantial evidence case is to prove guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence. Leflore v. State, 535 So.2d 68, 70 (Miss.1988). . . .The standard of review of a conviction based upon circumstantial evidence is that a circumstantial evidence conviction will not be disturbed unless it is opposed by a decided preponderance of the evidence. Id. at 70.

***Brown v. State,*** 556 So.2d 338, 340 (Miss. 1990). A review of the testimony summarized above can lead to no other conclusion: Morris is the individual responsible for the death of Brown.

¶26. After the State rested, Morris offered no defense. He made no attempt to contradict or disprove any evidence offered by the State. Taking the above facts as true, it is beyond the power of this Court to interfere with the jury's verdict. A jury's verdict will be reversed

by this Court "only where the evidence is such that reasonable and fair-minded jurors could only find the defendants not guilty." Jackson v. State, 689 So.2d 760, 766 (Miss.1997)(quoting Heidel v. State, 587 So.2d 835, 838 (Miss.1991)). "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." Herring v. State, 691 So.2d 948, 957 (Miss.1997); Jackson, 689 So.2d at 766. Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal. Herring, 691 So.2d at 957; Benson v. State, 551 So.2d 188, 193 (Miss.1989)(citing McFee v. State, 511 So.2d 130, 133- 134 (Miss.1987)).

*Pleasant v. State*, 701 So.2d 799, 802 (Miss. 1997). Because Morris did not attempt to rebut any of the State's evidence, we must take the evidence presented by the State as true and affirm the trial court's denial of Morris's Motion for a Directed Verdict as well as his Motion for J.N.O.V. This issue is without merit.

### II. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION IN LIMINE TO LIMIT TO ONE THE NUMBER OF WITNESSES ALLOWED TO TESTIFY TO DYING DECLARATIONS.

### V. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION IN LIMINE REGARDING CERTAIN DYING DECLARATIONS OF THE DECEDENT.

¶27. Morris filed a Motion in Limine regarding the statements made by Brown to his wife and Stewart. Morris argued that Brown's statement that "Jack Carey's grandson" shot him does not fall under the auspices of a dying declaration. A hearing was held on the motion, with the State presenting testimony to

support its position. The trial court issued an order finding that Brown's statements did constitute a dying declaration and would be admitted as such.

¶28. [Rule 804(b)(2) of the Mississippi Rules of Evidence](#) sets forth the hearsay exception regarding dying declarations:

> (b) **Hearsay Exceptions**. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . .
>
> (2) Statement Under Belief of Impending Death. In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death was imminent, concerning the cause of circumstances of what he believed to be his impending death.

(emphasis original.) This Court set forth the requirements regarding admissibility of dying declarations in *Watts*:

> The general requirements concerning the admissibility of dying declarations are as follows:
>
> 1. The wounded person is in extremis and dies after making the statement,
>
> 2. The person realizes that he is mortally wounded, and
>
> 3. He has no hope of recovery.

*Watts v. State*, 492 So.2d 1281, 1287 (Miss. 1986).

¶29. In the case sub judice, the trial court specifically addressed these three requirements in its order denying Morris's motion:

> The Court finds that when the statements were first made the victim/decedent was being transported by ambulance in an emergency condition, the victim realized that he had been shot and was being transported by ambulance to a larger hospital. The victim died 29 days later without his condition improving. The Court further finds that while in the hospital the victim/decedent made the statement "Jack Carey's grandson shot me" a number of times, at a time according to the wife's testimony that the doctors gave them no hope of the victim/decedent recovery.
>
> The Court finds no evidence to suggest bad feelings between the victim/decedent and Jack Carey's grandson, the defendant. As to any misstatements, the evidence is clear that the victim/decedent made the same statement a number of times before he died.
>
> This Court therefore finds beyond a reasonable doubt that the out of court statements made by the victim/decedent in this case were indeed dying declarations and is therefore, admissible under dying declaration exception to the hearsay rule.

As this Court has previously held:

> when the trial judge's determination is largely based upon a finding of fact, and he applied the correct legal standards, his determination should not be overturned unless his findings of fact were clearly

erroneous, as not being supported by substantial evidence.

*Watts*, 492 So.2d at 1289. Paramedic Stewart testified that Brown made no statements on the ride from the scene to the Lexington hospital. Brown did, however, tell Stewart who shot him on the ride from the Lexington hospital to University Medical Center in Jackson. Stewart testified that Brown told him he wanted Stewart to know who shot him in case he died. Stewart also testified that Brown would not have been transported to Jackson had he not been in critical condition. Stewart then testified that when there is a life threatening injury, the injured are transported to a major trauma center such as University Medical Center.

¶30. Rita Brown, the victim's widow, testified that her husband never left ICU during the 29 days that elapsed from the time he was shot until he died. She also testified that even though her husband could only whisper, he told her numerous times that Jack Carey's grandson had shot him. Brown also told his wife that "he knew he would never come home." Rita Brown testified that the doctors never gave them any hope of recovery.

¶31. Given the broad standard of review regarding a trial judge's factual determinations, it cannot be said that the trial judge erred in denying the motion in limine.

¶32. Morris also argues that the trial judge erred in allowing the State to present more than one witness to testify to Brown's dying declarations. Morris argues that allowing more than one witness is in "contravention of [Rule 3.09 of the Uniform Rules of Circuit and County Court Practice](#) which reads, in pertinent part, that '[n]o party shall subpoena unnecessary witnesses to repeatedly prove the same fact or set of facts.'"

¶33. The presentation of the two witnesses regarding the dying declaration was not duplicitous. As noted above, the *Watts* Court set out the test for admissibility regarding dying declarations. All three requirements must be met before the statement may be admitted. The testimonies of both Stewart and Brown's widow were needed in order to satisfy the three requirements:

¶34. Requirement 1: The wounded person is in extremis and dies after making the statement. Stewart testified at trial that Brown was in critical condition and that he was in danger of dying from his wounds. Brown did, in fact, die 29 days later.

¶35. Requirement 2: The person realizes that he is mortally wounded. Rita Brown testified that her husband told her he would not be coming home again.

¶36. Requirement 3: He has no hope of recovery. Rita Brown testified that her husband never regained any strength and that he was on a continuous, downhill slide after entering the hospital.

¶37. Stewart was the only person qualified to give an opinion as to Brown's condition when he made the statement in the ambulance. Stewart, on the other hand, never visited Brown in the hospital and could not attest to his knowledge of the seriousness of his injury. Such information had to come from Brown's wife. Therefore, the testimonies of Stewart and Rita Brown were not duplicitous and were properly admitted. This issue is without merit.

### III. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE.

¶38. Morris asserts that the trial court erred in overruling his motion to suppress all evidence seized at the time of his arrest as well as any statements he made to law enforcement after his arrest. Morris argues that there was no warrant for his arrest, that he was arrested without probable cause, and that all evidence seized at the time of his arrest was illegally seized. Not only was Morris arrested pursuant to an arrest warrant, probable cause existed to arrest him for the robbery and shooting.

¶39. After the hearing on the motion to suppress, the trial judge ruled that there was an outstanding warrant for Morris's arrest. The trial judge also ruled that even if there had not been a warrant, probable cause did exist to make an arrest.

¶40. This Court will not reverse a judge's fact-finding unless clearly erroneous and not supported by substantial evidence. *Watts*, 492 So.2d at 1289. The testimony given at the hearing clearly supports the trial judge's ruling.

¶41. During his sworn testimony at the hearing, Williams identified the faxed warrant that had been sent to the Lexington Police Department by the Tchula Police Department on January 21, 1997. The transcript shows that the defense counsel examined the warrant at the hearing.

¶42. Morris now complains that the warrant was never introduced into evidence. The defense had the opportunity to have the warrant entered into evidence and chose not to do so. As this Court has stated, it is Morris's duty, as appellant, "to see that the record of trial proceedings wherein error is claim[ed] is brought before this Court." *Brooks v. State*, 748 So.2d at 743 (citing *Smith v. State*, 572 So.2d 847, 849 (Miss. 1990) (citations omitted.)) Because the warrant is not before this Court, we must defer to the judge's ruling that an arrest warrant for Morris did exist at the time of his arrest.

¶43. Because an arrest warrant was issued for Morris's arrest, any items seized and any statements given as a result of that arrest are legal. Even if no warrant had existed, the police were justified in performing a search. As this Court stated in *White*, "[i]n the case of a search incident to arrest, the exception to the warrant requirement is founded upon the reasonable concern that the arrestee might have a weapon on his person or within reach, and that he may attempt to destroy evidence which is within his grasp." *White v. State*, 735 So.2d 221, 224 (Miss. 1999)(citing *Cupp v. Murphy*, 412 U.S. 291, 295, 93 S.Ct. 224, 2000, 2003, 36 L.Ed.2d 900 (1973)). Authorities entered the home and discovered Hicks in the front room on the sofa. Hicks denied that anyone else was in the home. The officers then discovered Morris in a back bedroom. A robbery had just taken place, and a man had been shot. The officers had probable cause to believe that Morris and Hicks had perpetrated the crime. As such, it is logical to assume that they would have been armed, thereby necessitating a search.

¶44. Regardless, the police had the permission of the owner of the house to search the house. "A voluntary consent to a search eliminates an officer's need to obtain a search warrant." *Jones v. State ex rel. Miss. Dep't of Pub. Safety*, 607 So.2d 23, 26 (Miss. 1991)(citing *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946)). Accordingly, this issue is without merit.

### IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING, OVER DEFENDANT'S OBJECTION, THE DRAWING OF A SECOND BLOOD SAMPLE FROM THE DEFENDANT.

¶45. Morris argues that the trial court erred in allowing his blood to be drawn a second time. Morris asserts

that because his arrest was an illegal arrest, the evidence, his blood, was also illegally obtained. In the alternative Morris argues that because it was not his fault that the original samples of blood were mixed up, it was a constitutional violation to withdraw a second vial of blood. Morris argues "[b]oth the Fourth Amendment to the United States Constitution and Art. 3 Section 23 of the Mississippi Constitution protect the security of the people '. . . in their persons.'"

¶46. Morris's arrest was lawful, thus was the withdrawal of his blood. In *Turner*, this Court noted that "[t]he United States Supreme Court in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) held that taking blood samples from a defendant who had been lawfully arrested did not violate his Fourth Amendment rights." *Turner v. State*, 726 So.2d 117, 126 (Miss. 1998).

¶47. The State argues that "[a] 'reasonable' search or seizure under the Constitution, is by definition a search or seizure conducted for good cause, rather than a search or seizure conducted arbitrarily, discriminatorily or capriciously."

¶48. The Mississippi Crime Lab found a discrepancy between the identification numbers of the vials of blood and the numbers listed on the submission form. Franovich requested a second sample of blood from Morris and Hicks in order to avoid a mixup regarding the DNA testing. Franovich tested both vials of blood that were allegedly taken from Morris, and they matched.

¶49. As this Court has previously held:

> [t]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness. 384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918.

*Bevill v. State*, 556 So.2d 699, 711 (Miss. 1990). So while there had been a discrepancy between the vial and the submission report, no mixup had actually occurred. However, the Mississippi Crime Lab, rightly so, requested new blood samples in order to avoid a grave injustice: potentially convicting a man of capital murder if he had not committed the crime. This issue has no merit.

### VI. WHETHER THE TRIAL COURT ERRED IN ADMITTING AUTOPSY PHOTOGRAPHS WHICH HAD NOT BEEN DELIVERED TO DEFENSE COUNSEL IN DISCOVERY AND WHICH PHOTOGRAPHS HAD NO PROBATIVE VALUE.

¶50. Morris argues that the trial court committed reversible error when it allowed autopsy photographs to be introduced into evidence when the photographs had not been delivered during discovery and had no probative value.

¶51. Morris alleges a discovery violation as a result of the failure of the State to turn over autopsy photographs. This Court has repeatedly held that

> the purpose of discovery is to avoid unfair surprise or trial by ambush. . . . However, "[t]he party alleging a discovery violation 'must affirmatively request it on pain of waiver.'"

*Brooks v. State*, 748 So.2d at 740 (citations omitted). In *Brooks*, the defense claimed that it was not provided with dental molds used to identify Brooks as the murderer. However, the defense failed to request the molds until their cross-examination of the State's witness. The State showed that the defense counsel was put on notice of the missing molds some three months before trial. Because the defense failed to request the missing molds, this Court ruled that Brooks's failure to demand discovery waived his right to protest.

¶52. In the case sub judice, Morris lodged an objection during the trial, as did Brooks, stating that they had never seen the photographs, nor did they know of their existence. The State replied, saying that defense counsel had been given a copy of the autopsy report and verbally notified that the photographs were there for their inspection. The State also noted that in the autopsy report it stated that there was photographic documentation of the autopsy. Likewise, Brooks's attorneys were in possession of the Medicolegal Opinion which stated affirmatively that several molds were missing. Morris, like Brooks, has waived his right to protest. This issue is without merit.

¶53. Procedural bar notwithstanding, "[i]t is well settled in this state that the admissibility of photographs rests within the sound discretion of the trial judge." *Brooks v. State*, 748 So.2d at 743 (citing *Westbrook v. State*, 658 So.2d 847, 849 (Miss.1995) (citations omitted)). "Photographs that are gruesome or inflammatory or that lack an evidentiary purpose are inadmissible as evidence." *Id*. The decision of the trial judge will not be disturbed absent a showing of an abuse of discretion. *Id*. "The discretion of the trial judge 'runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.'" *Id*.

¶54. The State asked the court to admit several pictures showing the autopsy of Brown. After ruling that the photographs were admissible, the trial judge examined the photographs and limited the number admitted to three: one to show identity, one to show the abdominal wound, and one to show the wound to the back. The judge carefully and thoughtfully examined the photographs and admitted only those that she felt were probative and not overly prejudicial.

¶55. Morris asserts in his brief that the trial judge allowed the photographs to be introduced and allowed defense counsel only fifteen minutes to look at them and talk to Dr. Hayne. Such is not the case. The trial judge asked Morris how long they would need to examine the photographs and question Dr. Hayne. Morris replied "15 minutes or so." The judge then granted them the time that the defense requested.

¶56. The photographs were properly admitted into evidence. A review of the three photographs reveals that they are not overly gruesome and do aid in the identification of the victim, as well as the description of his wounds. This issue is without merit.

### VII. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING A DEFENSE INSTRUCTION OF ALIBI WHICH PREVENTED APPELLANT FROM PRESENTING HIS THEORY AND GROUNDS OF DEFENSE.

¶57. Morris argues that because the testimony offered by Miller, as well as the testimony offered by Pyles and Wade, was sufficient to require the judge to offer an alibi instruction, the trial judge erred in not doing so.

¶58. Both Miller and Pyles testified as to the verbal statement that Morris had given at the time of his arrest.

The statement, however, was a verbal statement made by Morris that was handwritten by Pyles. During the direct questioning of Miller, the State asked Miller what Morris told him during his verbal statement. Miller testified that Morris had told him that he won the money found on him in a crap game played with "a group of guys." Miller testified that he tried to get Morris to identify the people he had played cards with so that the police could substantiate his story. The police were unable to confirm with whom Morris had actually played. Morris then told Miller that he had been at Sam Brown's store around 9:00 p.m. and that, after leaving, he had gone to Wade's home. On cross-examination, defense counsel simply read statements from Pyles's handwritten report into the record and then asked Miller if he remembered those statements.

¶59. Pyles's testimony basically mimicked that of Miller. Morris told him that he had won money in a crap game in Tchula playing with three individuals, Chris, Ricky, and T. Morris, however, was unable to provide the police with last names or a physical description of his three friends. Morris told the police that he and Hicks traveled in a van belonging to Hicks's grandmother. Morris and Hicks went to Sam Brown's store at approximately 9:15 p.m. so that Hicks could buy his baby some candy. Morris purchased nothing at that time. Morris and Hicks went to Wade's house, where Morris waited in the van for Hicks to return. After leaving Wade's house, the two men traveled to Morris's house where they watched a movie. At around midnight the two men left Morris' house and returned to Hicks's home where they went to sleep.

¶60. During the defense's cross-examination of Pyles, the defense attorney simply read into the record the verbal statement of Morris:

> "Morris stated that he and Hicks were going to see Pam Wade, who's the mother of Anthony Hicks' baby. Morris stated that Morris wanted to get some snacks for Hicks' baby. Morris stated that he and Hicks stopped at Sam Brown's store about 9:15 p.m., and Hicks bought several different candy items. Morris stated they left the store, went to Pam Wade's house. Morris stated he waited outside in the van while Hicks went inside. Morris stated that Hicks came out around 10:00 o'clock p.m., they drove to Morris's house and watched some movies. Morris stated that sometime after midnight they went to Hicks's residence and went to sleep. Morris stated that all the money in his pocket belonged to him; that he had won it earlier in the day shooting dice in Tchula. Morris stated he was shooting dice with Chris, Ricky, and T. No other information was given in reference to these names. Morris stated that he did not know anything about Sam Brown getting shot."

On re-direct the State asked Pyles why the interview had not be videotaped or recorded. Pyles responded saying:

> It's usually a rule of thumb, just - - uh - - usually when there's a confession, a taped statement is taken. Just in an interview, taped statements are not taken because they randomly just talk about everything; many things that may not be pertinent to an investigation.

¶61. Wade testified that Hicks came to her home about 9:45 p.m. the night of the shooting. Hicks asked Wade a question about the baby, but had no one with him. Wade never saw Morris at any time the day of the shooting. According to Wade, Hicks stayed approximately 10 or 15 minutes and left.

¶62. On cross-examination, Wade testified that it was approximately a ten minute drive from her apartment to Sam Brown's store. However, on redirect it was established that the apartment was only one-half mile from Sam Brown's store, not a ten minute drive as she originally testified.

¶63. This Court has stated that in considering an alibi instruction:

> in cases where a defendant interposes the defense of alibi, and **presents testimony in support of such a defense**, the defense is entitled to a jury instruction focusing upon such a theory.

*Young v. State*, 451 So.2d 208, 210 (Miss. 1984)(citing *Sanford v. State*, 372 So.2d 276 (Miss. 1979) (emphasis added)). It is fundamental in Mississippi jurisprudence that jury instructions must be supported by evidence. *Wilson v. State*, 592 So.2d 993, 997 (Miss. 1991). Morris states that "his statement submitted to the jury which was corroborated as to time and place by the witness, Pamela Wade, was certainly sufficient evidence to present this defense of alibi." The testimony presented by Wade does not corroborate Morris's statement. On the contrary, Wade stated that at no time did she see Morris the night of the robbery and shooting.

¶64. Morris then cites *Hester v. State* for the proposition that an alibi instruction should have been granted. Morris states that the conclusion in *Hester* fits his case:

> Hester has the same right as any other defendant to have his theory of defense submitted to the jury if supported by evidence. The record shows that Hester's version of the facts differs from the version related by State's witnesses. Hester established an evidentiary predicate for the defenses contained in his requested but refused instructions. The proffered instructions were the only ones presenting his theories of defense. It was reversible error for the trial court to refuse to grant the instructions embodying his defense theories.

*Hester v. State*, 602 So.2d 869, 873 (Miss. 1992). *Hester*, although legally sound, is factually distinguishable from the case sub judice. In *Hester*, two navy sailors were robbed at gunpoint, with one being fatally shot. *Id.* at 870. Hester testified that he repeatedly told the other three defendants that he would not rob anyone. *Id.* at 871. He also testified that he attempted to wrestle the gun away from the shooter. *Id.* at 871-72. Spicer, one of Hester's accomplices, testified that Hester was the person possessing the gun and was the one who actually fired the fatal shot. There was clearly conflicting evidence presented that would require the granting of the instructions regarding Hester's theory of defense: abandonment of the conspiracy.

¶65. Such is not the case here. No testimony was presented that would establish an alibi defense for Morris. Wade, the only witness who could possibly have provided an alibi defense for Morris, testified that she **never** saw Morris at her home on the night of the shooting. Morris maintains that Wade's statement supports his alibi theory and is "much more than 'meager or highly unlikely evidence.'" However, there is no evidence whatsoever to warrant an alibi jury instruction. This issue is without merit.

### VIII. WHETHER REVERSIBLE ERROR WAS COMMITTED BY THE CUMULATIVE EFFECT OF THE PROSECUTOR'S IMPROPER CLOSING ARGUMENT TO THE JURY.

¶66. Morris argues that the prosecution so misstated the facts in evidence during closing argument that a reversal is warranted. However, a review of the record shows that Morris made no contemporaneous objection to the alleged misstatements. As such, he is barred from bringing those misstatements before this Court. *Burns v. State*, 729 So.2d 203, 228 (Miss. 1998)(citing *Davis v. State*, 660 So.2d 1228, 1255 (Miss. 1995)).

¶67. Procedural bar notwithstanding, Morris's contention that "[t]here was no testimony of any blood, human or otherwise, on the money taken from the Appellant" is incorrect. During the testimony of Pritchard, she stated that the money tested positive for the possible presence of blood. A review of the prosecution's closing argument shows that the prosecutor said

> It got there off of the money that the young lady told you was possibility of blood. Possibly blood. It got there off of the money when he took Sam Brown's money and put it in his pocket.

As this Court stated in *Burns*:

> [c]ounsel is allowed considerable latitude in the argument of cases, and is limited not only to the facts presented in evidence, but also to deductions and conclusions he may reasonably draw therefrom, and the application of the law to the facts.

*Burns*, 729 So.2d at 227(citing *Wells v. State*, 698 So.2d 497, 506 (Miss. 1997)). It is quite conceivable that one could draw the conclusion that Morris got the blood on his jeans when he placed the money, which was found to possibly have blood on it, in his pocket.

¶68. Morris also argues that the prosecutor committed reversible error when he stated "[w]hen he went in the room to get him [Morris], not only did Jontae Morris deny that he was Jontae Morris, he said them are my pants." The testimony of Miller at trial revealed that when he asked Morris if he was Morris, Morris did not answer. While Morris did not affirmatively deny his identity, he also did not affirm his identity. The inference can permissibly be drawn that Morris had something to hide by not revealing his identity. As such, this issue is without merit.

## CONCLUSION

¶69. After careful review of the issues raised by Morris, this Court can find no errors warranting reversal. Accordingly, the judgment and sentence of the trial court are hereby affirmed.

¶70. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT BENEFIT OF PAROLE IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED.**

**PRATHER, C.J., SMITH, WALLER, COBB AND DIAZ, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE AND MILLS, JJ.**

**BANKS, PRESIDING JUSTICE, DISSENTING:**

¶71. Morris was entitled to the alibi defense instruction. Although there is conflict between Morris's statement and the testimony of the co-defendant's child's mother, the determination of whom to believe is the sole province of the jury. However, to deny the defendant the instruction on his defense is reversible error. Accordingly, I respectfully dissent.

¶72. The jury heard evidence that warrants an alibi instruction. Miller testified that Morris had given a statement that he and the co-defendant, Anthony Hicks, went to see Pam Wade, who is the mother of Hicks's child. Morris's statement said Morris and Hicks stopped at Sam Brown's store at 9:15 on the night

in question and purchased candy and that they left the store and went to Pam Wade's house where Jontae Morris remained outside while Hicks went in. He further stated that Hicks came out around 10:00 p.m. and that they drove to Jontae Morris's house and watched movies and after midnight they went to Hicks's residence and went to sleep. Pamela Wade testified that on January 28, 1997, Hicks came to her house around 9:45 p.m. to see the baby, but she saw no one with him. She said that Hicks left around 10:00 p.m. and it would have taken 10 minutes to drive from her house to the Courthouse square, which was the scene of the shooting of Sam Brown.

¶73. The prosecution sought to prove that Hicks and Morris were together at the scene of and at the time of a robbery which occurred at 10:00. Wade's testimony puts Hicks elsewhere and corroborates Morris's testimony that Hicks was with Wade and, inferentially, that he, Morris, was outside at Wade's house, even though Wade did not see Morris.

¶74. The defendant is entitled to put on a theory of defense. Moreover, the defendant is entitled to have an instruction on his theory of the case. *De Silva v. State*, 91 Miss. 776, 45 So. 611 (1908). Morris's defense need only arise from the evidence and it is not necessary that the defendant put on that evidence. In considering whether an alibi defense is appropriate all evidence must be considered together. *Sanford v. State*, 372 So.2d 276, 278 (Miss. 1979). Because this was the defendant's only defense our precedents dictate reversal. *Hester v. State*, 602 So.2d 869, 873 (Miss. 1992); *Holmes v. State*, 481 So.2d 319 (Miss.1985); *Newton v. State*, 229 Miss. 267, 90 So.2d 375 (1956).

¶75. In *Holmes*, this Court reversed the defendant's conviction because the Court refused an alibi instruction. There, Holmes asserted that he was at home at the time the State claimed that he was committing the crime of burglary. 481 So. 2d at 321. The trial judge rejected the alibi instruction because of the weak evidence presented. *Id*. In reversing, this Court noted a prior holding where this Court held as follows:

> In *Sanford v. State*, 372 So.2d 276 (Miss. 1979), a case similar to the instant one, this Court stated:

> "Alibi" as a defense is well established in our criminal jurisprudence. We have held many times that alibi testimony, if believed by the jury when considered along with all other evidence, requires acquittal. Without question, one who interposes an alibi as the theory of his defense, and presents testimony in support of such a plea, is entitled to a jury instruction focusing upon such theory.

> *Id*. at 278.

*Holmes v. State*, 481 So.2d at 321. In the face of conflicting evidence from the State, this Court reiterated that the trial judge should allow the jury to determine the weight and credibility of the evidence. *Id*. at 322.

¶76. Here, there was conflicting evidence of Morris's whereabouts at the time of the robbery. As stated, the jury decides who to believe. Moreover, the trial court errs when it takes the opportunity for that decision away.

¶77. For the foregoing reasons, I dissent.

**McRAE AND MILLS, JJ., JOIN THIS OPINION.**